UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Leafwell, Inc.,
a Delaware corporation,
      *Plaintiff*,

v.                                                          Case No.: 2:25-cv-1132

The Doc App, Inc.
d/b/a My Florida Green,
a Florida corporation,
      *Defendant.*

_____

## COMPLAINT

Now comes the Plaintiff, Leafwell, Inc. ("Leafwell" or "Plaintiff") and, by and through its Undersigned Counsel, and files this Complaint against Defendant, The Doc App, Inc. d/b/a My Florida Green ("MFG" or "Defendant"). In support of the relief requested herein, Plaintiff hereby states as follows:

## I. INTRODUCTION

At some point in 2025 MFG recognized that its competitor, Leafwell, was finding great success in the industry that the two parties share; and, with a limited pool of clientele, MFG (by its own admission) was on the losing end of Leafwell's commercial success. So, as MFG's own Chief Executive Officer put it, MFG apparently concocted a plan to "take [Leafwell's] business down."

To that end, MFG's CEO and "Inhouse Corporate Counsel" recklessly directed an AI platform to concoct a "Verified Complaint" (which, notably, they verified under the penalty of perjury). Despite the many legal and factual deficiencies,

inconsistencies, problems, and other issues with that AI-generated complaint, MFG weaponized it – using the lawsuit as a mechanism of unlawfully extorting Leafwell to serve its own ends.

Before Leafwell could react, MFG launched a multi-pronged attack during the weeks immediately following the filing of the "Verified Complaint" – apparently hoping to batter Leafwell into submission. MFG's overarching goal was to force and/or extort Leafwell into substantially altering its own business practices, in a way that (in MFG's view) would effectively eviscerate Leafwell's ability to compete with MFG as it had been.

With the "Verified Complaint" at its core, MFG's scheme included a media blitz, the CEO's causing a scene at a Leafwell's event, threats and demands to Leafwell's third-party collaborators, and maligning Leafwell to its current and/or potential customers, among other things. And MFG did find some initial success. As a direct result of MFG's actions, Leafwell's professional relationships were severed, current and/or prospective customers were lost, and it incurred substantial financial damage. And throughout all of this – by way of repeated communications from MFG's "Inhouse Corporate Counsel" – MFG endeavored to extort confidential information from Leafwell, and to convince Leafwell to shut down its business so that the campaign and its recently-filed lawsuit would end.

But, as Leafwell soon discovered, MFG's lawsuit had a number of fundamental flaws. Indeed, the U.S. District Court for the Middle District of Florida observed areas of "serious concern" when brought to the Court's attention by Leafwell. Indeed,

MFG's principle statutes for liability did not afford a private right of action; and one was even part of the criminal code. But even more egregious was MFG's reckless, rampant, and unabashed use of AI.  One of MFG's filings contained a dozen hallucinated, fabricated, and/or completely unsupportive legal citations.

The Court ordered MFG's in-house counsel to show cause why he should not be sanctioned for his "numerous" misrepresentations to the Court. His response was to double down on MFG's position, and ignore all responsibility. In fact, he continued on his crusade against Leafwell, contending that everyone but himself and MFG caused the issue. The Court found this explanation to be "as colossal a collection of excuses and projection as the Court has seen in 25 years on the bench." Thus, the Court imposed severe sanctions on him warranted by the situation.

But MFG already insulated itself from accountability for its own scheme. The same evening that its in-house counsel filed his response to the show cause order, MFG filed a notice of voluntary dismissal. MFG's stated reason for doing so was to bring another action in state court; which MFG's in-house counsel has repeatedly threatened is imminent. Thus, MFG found a new place to restart its now severely discredited campaign.

The issues in this case are simple. MFG and its in-house counsel concocted a scheme to extort Leafwell and ruin its business – in part through the use of fabricated case law, which resulted in sanctions for MFG's in-house counsel alone. But he is no stranger to this territory. In fact, he has been sanctioned for fabricating legal claims in the past; but ultimately, he evaded responsibility and payment through bankruptcy.

Here, it is almost certain that he will evade accountability once again – leaving Leafwell with nothing. In this circumstance, MFG must be held vicariously liable and answer for its employee's conduct.

Moreover, MFG cannot be allowed to continue its campaign in state court without assuring that its employee fulfills his court-imposed sanctions. To allow otherwise only causes Leafwell to incur further damage in the wake of a lawsuit MFG rendered needless. Thus, MFG must be enjoined from filing any further litigation against Leafwell until: the ordered attorneys' fees are paid, MFG's in-house counsel fulfills the other Court directives, and the sanction order is satisfied.

But ,now, its MFG's turn to be held accountable for its conduct. MFG, through its Chief Executive Officer, worked in tandem with its in-house counsel to weaponize the judicial process to extort information and "take [Leafwell's] business down." Because of MFG's failed first attempt, Leafwell has incurred significant legal fees, expenses, and other damages for a meaningless effort. MFG must be held responsible for this damage.

But even if it can escape scrutiny for its scheme once again, it nonetheless cannot shirk its obligation to supervise its employees conduct – especially where it knew its counsel's sanction history. Moreover, MFG's onslaught of self-serving press and its CEO's public outbursts independently caused Leafwell to loose business relationships and prospects – damaging Leafwell even further.

Simply, it is time for Leafwell to be made whole for the damage MFG has done.

## II. THE PARTIES

1.    Defendant, MFG, is a Florida corporation with its principal place of business in Naples, Florida.

2.    Plaintiff, Leafwell, is a Delaware corporation registered to do business in the State of Florida and dozens of other states.

3.    Leafwell is a telehealth platform with its leadership spread throughout the United States and Europe.

4.    Leafwell's Chief Executive Officer is located in the United Kingdom; Leafwell's Chief of Staff is located in the United Kingdom; Leafwell's Chief Operating Officer is located in Virginia; Leafwell's Marketing Director is located in Texas; Leafwell's Head of People is located in Illinois; and Leafwell's lead Product Manager is located in North Carolina.

5.    Leafwell conducts in-person board meetings in the United Kingdom, Virginia, and Pennsylvania, and has never conducted a board meeting in Florida.

6.    The execution of Leafwell's technology development is performed by contractors in Portugal and Romania.

7.    Leafwell's maintains its corporate bank account with an online banking platform which does not have physical branches. Payments to Leafwell's creditors originate from this online bank account.

8.    Leafwell's principal place of business is not in Florida. No person on Leafwell's executive leadership team is located in Florida.  No person on Leafwell's

leadership team maintains an office at, or otherwise conducts business at, any Florida address.

### III.    JURSIDCTION AND VENUE

9.    The Court has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000 dollars, exclusive of interest and costs.

10.    Additionally and independently, the Court also has federal question jurisdiction, under 28 U.S.C. § 1331, because at least one claim in this action concerns the interpretation and/or enforcement of order(s) that the U.S. District Court for the Middle District of Florida issued.  And given that, insofar as any of the claims herein fall under Florida state law and do not concern such interpretation and/or enforcement of such orders, this Court has supplemental jurisdiction of those claims under 28 U.S.C. § 1367.

11.    This Court has personal jurisdiction over the Defendant because it conducts, and continues to conduct, business within the State of Florida. MFG is a Florida-domiciled business with a principal place of business in Naples, Florida, and otherwise has voluntarily submitted to the jurisdiction of Florida Courts.

12.    Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because the Defendant is a resident of this District, and all or a substantial part of the events or omissions from which Leafwell's claims arise occurred in this District.

## IV.    <u>BACKGROUND</u>

13.     Leafwell is a telehealth platform that assists patients with obtaining medical marijuana cards, among other things. Leafwell's mission is to make treatment easier, more affordable, and more accessible for patients.

14.     Upon information and belief, MFG is a Florida-based provider of services connecting patients with physicians for purposes of obtaining Florida medical marijuana certifications.

15.     At all relevant times, Nicholas Garulay ("Garulay") was, and continues to be, MFG's founder and Chief Executive Officer.

16.     At all relevant times, Jason K. Castro, Esq. ("Castro") was, and continues to be, MFG's (only) in-house legal counsel. In fact, MFG's website[1] publicly holds Castro out as its "In-House Corporate Counsel."

17.     Upon information and belief, Castro receives a monthly salary from MFG for his role as the company's in-house counsel.

18.     At some point in 2025, MFG came to believe that Leafwell – its apparent competitor – was the cause of its declining revenues and popularity. MFG believed itself entitled to the entire population of the State of Florida as clients, and felt Leafwell was impeding on its territory.

---

[1]     https://myfloridagreen.com/team-member/jason-k-castro-esq/

A. **The Cease and Desist Demand Letter**

19.    Thus, on or about August 22, 2025, MFG sent Leafwell correspondence constituting a demand letter (the "C&D Demand") via certified mail to Leafwell's registered agent in Florida. A true and accurate copy of the C&D Demand is attached hereto as **Exhibit A**.

20.    The C&D Demand was authored by Castro, and his signature block noted his role as MFG's "Inhouse Counsel." Ex. A at 5. In addition, the C&D Demand was written on MFG's letterhead, which included "Jason Castro, IHC" on the very first page. Id. at 1.

21.    Despite MFG's status as a private (and non-governmental entity), the C&D Demand alleged to be "formal notice" that Leafwell was "actively engaged in business practices [ ] that violate multiple provisions of Florida law." Id. at 1.

22.    In sum, MFG's C&D Demand alleged that Leafwell's free certification events violated Fla. Stat. § 817.505 (the "Patient Brokering Act") and Fla Stat. § 381.986.[2] Id. at 1-2. However, as a matter of law (and as the U.S. District Court for the Middle District of Florida noted several months later), neither of these statutes allow a private entity (like MFG) to sue another private entity to enforce them.

23.    The C&D Demand went on to allege that Leafwell was "actively organizing and executing mass 'free medical marijuana certification' events," which

---

[2]    Initially, MFG's allegations rested on § 381.986(1)(h) – which is the definition of "marijuana delivery device." See Ex. A. Later, MFG reverted to relying on § 381.986(3)(b)

"constitute[d] a commercial scheme designed to induce patient flow" to medical marijuana treatment centers ("MMTCs"). *Id.* at 1-2.

24.     Premising its C&D Demand on Leafwell's supposed violation of these two laws that lack any private right of enforcement, MFG contended that Leafwell's alleged conduct was "actionable under multiple statutory and common law theories." Id. at 2.

25.     In the C&D Demand, MFG, through Castro as its in-house counsel, stated that MFG was "preparing a civil complaint" – apparently in order to enforce these laws against Leafwell. *See id.* at 3.

26.     In addition, the C&D Demand demanded that Leafwell, within five (5) business days, comply with the following: (i) alter its business practices (ii) provide MFG with the names and NPI numbers of all Florida physicians certifying patients with Leafwell; (ii) provide MFG with all financial relationships and referral agreements between Leafwell and Florida MMTCs; (iii) provide MFG with the number and location of Florida-based "free-certification" events for the past year; and (iv) provide MFG with any written agreements or contracts with dispensaries or marketing firms related to patient acquisition. *Id.* at 4.

27.     Thus, MFG demanded that Leafwell (its competitor) disclose aspects of its business far beyond its alleged complaint of "free certification programs" – under the threat of commencing civil litigation.

28.     Indeed, per MFG, Leafwell's noncompliance with these demands would "result in immediate initiation of civil litigation." *Id.* MFG wanted to control the entire

clientele population of Florida, and decided Leafwell was at fault for its declining revenue and position.

29.    Leafwell declined to respond to the C&D Demand. Leafwell also did not provide any of the information that MFG demanded.

**B.  The Florida State Court Action**

30.    On September 3, 2025, MFG filed a complaint in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida (the "State Court Action"), styled *The Doc App, Inc. d/b/a My Florida Green v. Leafwell, Inc.*, Case No. 25-CA-4788, which it then amended on September 15, 2025.

31.    Specifically, the September 15, 2025 filing was a Verified Complaint for Injunctive Relief and Damages (the "Verified Complaint"), a true and accurate copy of which is attached hereto as **Exhibit B**.

32.    Page 19 of the Complaint contained the following verification – under "penalty of perjury":

> **VERIFICATION:** Pursuant to Fla. Stat. §92.525, the plaintiff declares under penalty of perjury that the factual allegations in this Verified Complaint are true and correct. (See Attached as **Exhibit P1, P2, P3**.)

33.    Castro signed the Complaint as counsel. Exhibits P-1 and P-2 to the Verified Complaint were Affidavits from Garulay, signed before a notary public in the State of Florida. Ex. B at 50-52, 55.

34.    MFG contended that Leafwell's practices were somehow deceptive to patients because Leafwell advertised "free" medical marijuana certifications without

disclosing that the service was being paid for by a third party – instead of the patients. *See id.* at 5, ⁋ 8.

35.     Based on this position, MFG asserted claims for: Violation of Fla. Stat. § 501.204 (Count I), Tortious Interference with Business Relationships (Count II), Unjust Enrichment (Count III), Civil Conspiracy (Count IV), and Declaratory and Injunctive Relief (Count V). *See id.* at 10-18.

36.     However, MFG's Verified Complaint displayed numerous concerning deficiencies – both in its allegations and references to evidence. For example, neither the Patient Brokering Act nor Fla Stat. § 381.986(3)(b) afford a private right of action. The federal court's later November 6, 2025 Order to Show Cause[3] and its November 26, 2025 Opinion and Order[4] expressly noted that some these issues constituted areas of "serious concern."

37.     But those are only a few examples. MFG's Unjust Enrichment claim (Count III) did not allege that MFG conferred any direct benefit onto Leafwell – meaning the entire claim was facially insufficient. *See* Ex. B at 11-12.

38.     Additionally, Exhibit P-2 was an "Attorney Certification Pursuant To Rule 1.610 Certification of Counsel Regarding Notice." *Id.* at 53-54. Strangely, this was not signed by Castro (MFG's in-house counsel and litigator); instead, the notary block indicates that it was endorsed by Garulay, although it lacks his signature. <u>See</u> <u>id.</u> at 54. Upon information and belief, Garulay is not an attorney in the State of Florida.

---

[3]    *The Doc App, Inc. v. Leafwell, Inc.*, No. 2:25-cv-838-SPC-NPM, D.E. 25 at 2 (M.D. Fla.).
[4]    *Id.* at D.E. 3.

39.    The "Verified" Complaint (signed under penalty of perjury) also relied upon, and expressly attested to, the presence of a number of quotes and other propositions from within the exhibits that were appended to it. However, in multiple instances, the exhibits themselves did not contain anything remotely resembling the quotes or proposition(s) for which they were cited.

40.    As just one of many examples: MFG contended that exhibit B to the Verified Complaint – Leafwell's own social media post – itself said that the free certification events were "tied to commercial arrangements and marketing incentives[.]" Id. at 6, ⁋ 9. Clearly, the exhibit does not say this. See id. at 21

41.    And, other key "Verified" allegations were plainly contradicted by MFG's own exhibits. For instance: MFG alleged that exhibit A to its Verified Complaint was advertising "'free' medical marijuana certifications." Id. at 5, ⁋ 8. But exhibit A was a social media post about Leafwell's membership program – which costs $9.99 per month, as the exhibit unambiguously demonstrated. See id. at 20.

42.    Upon information and belief, MFG, through its in-house counsel, used artificial intelligence to fabricate its legal theories and craft its allegations out of whole cloth – as reflected by the pleading's circular logic and incongruencies and its "formulaic, singsong manner—seemingly lifelike on the surface, yet devoid of much substantive legal argument on the merits—the tell-tale hallmarks of generative AI work product." See O'Brien v. Flick, No. 24-61529-CIV, 2025 U.S. Dist. LEXIS 10625, at *14 n.5 (S.D. Fla. Jan. 10, 2025). And notably, to that point, MFG later expressly admitted – in writing, by and through Castro – to relying upon AI for drafting legal filings.

43.    On the same date that MFG filed its Verified Complaint in the Florida state court, it also filed an ex parte Emergency Motion for Temporary Injunction. However, despite the fact that MFG was aware of the identity of Leafwell's registered agent (since that is who received MFG's C&D Demand), MFG declined to take any steps to serve Leafwell's registered agent with its Verified Complaint or with its ex parte Emergency Motion for Temporary Injunction.

44.    Upon information and belief, MFG and its in-house counsel deliberately chose not to serve Leafwell with the Verified Complaint or the ex parte motion – for the specific purpose of concealing their actions from Leafwell, and in an effort to get immediate (unopposed) relief while exerting minimal cost and effort.

45.    However, before MFG could get its requested ex parte relief from the Florida state court, Leafwell discovered the State Court Action. On September 19, 2025, Leafwell removed it to the United States District Court for the Middle District of Florida under Case No. 2:25-cv-838-SPC-NPM (the "Federal Court Action").

## C. MFG's Media Campaign Against Leafwell

46.    Shortly after initiating the State Court Action, MFG went on an immediate public media smear campaign against Leafwell in an apparent effort to weaponize the courts while avoiding judicial scrutiny for their allegations, all in an effort to preemptively force Leafwell to fold under the intense and sudden pressure – by capitulating to its extortive demands.

47.    For instance, MFG posted a September 18, 2025 press release on its website that was titled "How My Florida Green Protects Patients While Leafwell

Undermines Trust." A true and accurate copy of this article is attached as **Exhibit C**. Capitalizing on the allegations in its Verified Complaint – which, upon information and belief, was created by artificial intelligence – it contended that "[Leafwell's] model puts sales first. . . [MFG's] puts patients first." Ex. C at 1.

48.    On September 12, 2025, MFG publicly posted on its Facebook page a press release caption "FOR IMMEDIATE RELEASE[.]"

49.    This post publicized MFG's lawsuit against Leafwell, stating "[t]he Complaint alleges that Leafwell, working with national dispensary chains, offered 'free' certifications subsidized by dispensaries – a practice that misleads patients and undermines physician independence[.]"

50.    This post also quotes Garulay as saying "[t]hese practices undermine the trust patients place in their physicians," among other things.

51.    Based on MFG's own self-created allegations, Garulay personally interacted with other user's comments, saying things like: "[t]his is a gimmick"; "[y]ou know the effort and money I've invested along with the time and sacrifice. I'm not sitting idle and watching this go down . . . "; and "[t]hese people are going down, and hard!"

52.    As an aside, despite MFG's efforts to convince the Florida government to prosecute Leafwell in order to gain a leg-up on its competition, Leafwell has never been contacted, subpoenaed, or charged by any of the pertinent Florida state agencies.

53.    On September 17, 2025, and again with heavy reference to AI-generated complaint, MFG posted another article on its website titled, in part, "What Is Patient Brokering? How Leafwell's Practices Threaten Florida's Medical Cannabis Program."

54.    In one portion, this article stated that "[r]ecently, questions have been raised about Leafwell, a telehealth platform offering medical marijuana certifications. According to our [MFG's] Verified Complaint, Leafwell partnered with dispensaries to offer 'free' cannabis certifications at pop-up events."  Of course, these "questions" had solely been raised by MFG via its AI-generated "Verified" Complaint.

55.    MFG posted another article on its website on September 18, 2025, describing its lawsuit against Leafwell; therein, it feigned sincerity in its statement that "[t]his lawsuit isn't about removing competition." But again, MFG capitalized on its own AI-generated allegations that Leafwell was engaging in "[u]nlawful inducements," "[d]eceptive practices," and "[p]atient brokering schemes."

56.    On September 19, 2025, MFG made another post on its Facebook page, which – again relying on its Verified Complaint against Leafwell – asserted that "Justice is coming" for Leafwell and all of the individuals and entities with which it collaborates. This article also contained a link to one of MFG's previous press releases published on its website.

57.    In addition, Castro is quoted in a September 23, 2025 Law.com article,[5] claiming that the Verified Complaint was filed to "protect[ ] patients."

---

[5]    https://www.law.com/dailybusinessreview/2025/09/23/medical-marijuana-company-accuses-doctors-of-colluding-with-dispensaries-/

58.     On or about October 10, 2025, Garulay also provided an interview for a local news station.[6] Among other things, he rested on MFG's filing of their complaint and said, "I'm not going to sit on my hands and watch a group like this take over **and displace these people** that are suffering from debilitating conditions." Of course, it is unclear from MFG's complaint how patients were being "displaced." *See* Ex. B.

59.     Upon information and belief, and given his course of conduct, Garulay contacted other news providers and platforms, using MFG's Verified Complaint, in an attempt to cause Leafwell to lose customers and ultimately pressure it to fold to MFG's extortive demands.

### D. **MFG's Continued Harassment of Leafwell**

60.     On September 25, 2025, after Leafwell removed MFG's lawsuit to Federal Court, Castro emailed Leafwell's counsel for a meet-and-confer regarding MFG's "forthcoming emergency motion for injunction and temporary protective order."

61.     In this same subject, Castro stated that "[o]ur position has already been reduced to writing in the filings, but I am willing to hear your client's position during our discussion."

---

[6]     https://www.gulfcoastnewsnow.com/article/naples-medical-marijuana-dispensary-kickbacks/69002675

62.    Shortly after this, on September 25, 2025, Castro again emailed Leafwell's counsel saying "Plaintiff intends to move **aggressively** and seek immediate relief on the **TRO and preliminary injunction**" (emphasis in original).

63.    Castro's second email attempted to extract information from Leafwell's counsel which, upon information and belief, he intended to use to MFG's benefit in the lawsuit (including a potential, and subsequently-threatened, amendment to include other third parties as defendants). In fact, per Castro, MFG wanted Leafwell to halt its business practices – regardless of dispensary involvement – *before* the court ruled on the threated motion for temporary restraining order.

64.    That same evening, responding to Castro's email, Leafwell's counsel suggested a call next week for the meet-and-confer. Castro never reverted to schedule a call, and instead declared on October 2, 2025 that MFG would be filing its Motion for TRO and Preliminary Injunction next day.

65.    Meanwhile, Castro sent no fewer than nine (9) cease and desist demands to dispensaries and other companies via email on September 30, 2025 – similar in sum and substance to what MFG used to first threaten Leafwell. Castro copied Leafwell's counsel to these communications.

66.    This correspondence said, among other things, "Please be advised that our office represents **The Doc App, Inc. d/b/a My Florida Green**. A copy of the **Verified Complaint** *currently* [*sic*] **pending in federal court** is attached for your

review. Litigation has already been initiated against Leafwell, Inc." (emphasis in original).

67.     In his emails, Castro also stated that he copied Garulay (among others), specifically "to ensure the client is aware of all communications."

68.     Additionally, on October 3, 2025, Garulay went to a Leafwell event in St. Petersburg, FL.

69.     After sitting down with one of the providers, Garulay requested their name and length of time they had worked with Leafwell. Following this, Garulay recorded the information on a printed cease and desist notice – which he gave to the provider. Garulay recorded this interaction.

70.     Upon information and belief, based on Garulay's conduct, this was another effort to detrimentally impact Leafwell's ongoing business, its contracted partners, and its economic prospects at the event.

71.     Garulay then created a massive scene at the event, acting in a disruptive and threatening manner. Garulay proclaimed that he would "take the business down," and directed similar comments towards others at the event.

72.     Garulay was then asked to leave the event by onsite staff.

**E.  MFG's Motion for TRO**

73.     On October 14, 2025, MFG filed a Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion for TRO") in the Federal Court Action. Federal Court Action, D.E. 17.

74.    In numerous places in its papers, MFG cited legal authority that did not exist, quoted cases that did not have the quoted language, and misrepresented propositions of various decisions. *See id.*

75.    Leafwell brought all of these matters to the Court's attention in its Opposition, which was filed on October 28, 2025. *Id.*, D.E. 19.

76.    Also on October 28, 2025, Leafwell's counsel emailed Castro for a meet and confer regarding a motion for sanctions given the false and fictitious case citations cited in MFG's TRO Motion.

77.    Castro responded that same day stating (among other things) that he uses "AI tools only to assist with drafting and document organization [ ] but all legal analysis and final language are human-authored and attorney-verified." On behalf of MFG, Castro claimed that every case was "reviewed for context, accuracy, and proper pin cites," "compared word-for-word to the official reporter" where needed, and Castro personally confirmed that all of his work "is valid and correctly characterized."

78.    Rather than engage with Leafwell's counsel about a meet-and-confer (required, of course, under the local rules), Castro instead characterized her request as "childish unsupported demands" and told her to "[d]o your job and draft a proper response."

79.    In a later October 28, 2025 email, Castro again attempted to use the situation to leverage information out of Leafwell's counsel that (on information and belief) it intended to subsequently use to its benefit against Leafwell and/or others. Castro's email characterized Leafwell's analysis of his hallucinated cases as

"unfounded" and the meet-and-confer request as "threats/games." And, per Castro, if Leafwell "did not want to engage on the merits, [MFG would] respond accordingly before the Court. It's up to [counsel] how [they] want to spend your time." In that email, and in emails and court filings that followed, Castro "baselessly accuse[d]" Leafwell's counsel of violating the Florida Rules of Professional Conduct, "turn[ing] his unconvincing defense into blustering offense." *Id.*, D.E. 37 at 11

80.    But later that same evening, on October 28, 2025, Castro did acknowledge that there was an issue with his citations. However, he characterized that problem only as "a technical citation issue" – suggesting that Leafwell's counsel was less than "competent" for suggesting otherwise, and that Leafwell's counsel's approach was mere "rhetoric." Castro declared that he would file "an Amended Motion that supersedes the prior filing and contains only verified, properly cited authority."

81.    On October 29, 2025, Leafwell informed Castro via email correspondence that it did not consent to MFG's filing of an amended motion. This was, of course, because the Middle District of Florida's Local Rule 6.02(d) governing preliminary injunctions states "[n]o party may amend a motion or response without leave."

82.    On October 30, 2025, MFG filed a Notice of Intent to File Amended Motion for Temporary Injunction (the "Notice"). *Id.*, D.E. 20.

83.    In its Notice, MFG misrepresented to the Court the reasons for the "amended motion"; MFG stated that it was withdrawing its original TRO Motion to

file a renewed motion supported by "revised representations, corrected citations, additional legal support, and evidentiary support. . ." *Id.*, D.E. 20 at 1.

84.    The Notice also represented that Castro "has initiated conferral with [Leafwell's] counsel regarding the renewed motion and continues those discussions in good faith." *Id.* at 2.

85.    On November 5, 2025, the Court entered an Order withdrawing MFG's original TRO Motion "based on [D.E.] 20 Plaintiff's Notice of Intent" – which, again, did not accurately reflect Leafwell's position on MFG's Amended Motion. *See id.*, D.E. 21. Thus – like the rest of its conduct – MFG was able to effectively misrepresent what it was doing and conceal its true motive and intent.

86.    That same day, MFG filed its Amended Motion for Temporary Restraining Order and Preliminary Injunction (the "Amended Motion"). *Id.*, D.E. 23.

87.    MFG's purported Amended Motion for Temporary Restraining Order then asserted that Leafwell's summary of MFG's own allegations constituted admissions on the "record," and also directly responded to the point sin Leafwell's opposition, while also attempting to (unsuccessfully) shore up the many legal and factual deficiencies from its original Motion for TRO. *See id.*

### F. The Court's Order to Show Cause

88.    On November 6, 2025, the Court struck MFG's Amended Motion for non-compliance with the local rules of the Middle District of Florida. *Id.*, D.E. 24.

89.    The same day, the Court issued an Order to Show Cause (*id.*, D.E. 25), directing Castro to show cause "why he should not be sanctioned for his numerous

misrepresentations of legal authority to the Court and why he should not pay Defendant's legal fees and costs incurred responding to the motion." *Id.* at 4.

90.     In its Order to Show Cause, the Court noted, among other things, that Leafwell "identifie[d] several areas of serious concern in its response to the motion." Id. at 2. This included the fact that §§ 817.505 and 381.986(3)(b) create no private right of action." Id. In fact, "one statute is part of the criminal code." But these were not the only "noteworthy discrepancies." *Id.* at 2.

91.     Focusing on MFG's clearly fabricated case law, the Court relayed that it "spot-checked several (but not all) cases [Leafwell] flagged" and came to the same conclusion about many of the fictitious and/or miscited authority. *Id.* at 2-3. In any event, the Court declared that it "need not cite check each one [of the dozen flagged by Leafwell] to see the writing on the wall." *Id.* at 3.

92.     The Court continued by stating that the preceding Notice of Intent (*id.*, D.E. 20) made no effort to explain "what sources [Castro] relied on" or where he found the "sham" cases and quotations. *Id.*, D.E. 25 at 3.

93.     Castro filed his Response to the Order to Show Cause ("MFG's Response") on November 10, 2025. *Id.*, D.E. 30.

94.     On the one hand, Castro claimed to "own what is [his]" (*id.* at 1), and on the other, blamed Leafwell's counsel for failing to meet and confer, failing to clarify the issues, and lacking in professionalism and candor. *See id.* at 2. Castro even went so far as to suggest that Leafwell's counsel caused the current situation and harm to begin with, and that it was actually Leafwell's counsel who should be sanctioned. *Id.* at 12.

95.     Within MFG's Response, it precisely and unambiguously laid out its plan for what would happen next. Specifically, it previewed that it would "[c]ontemporaneous[ly]" utilize a voluntary Fed. R. Civ. P. 41(a)(1)(A)(i) withdrawal as a mechanism of (i) deliberately minimizing the scope of the Court's potential sanctions against it, while (ii) preserving its ability to "refile [the case against Leafwell] in Florida state court" while attempting to name additional Florida-based Defendants for the purpose of defeating diversity and divesting the federal court of jurisdiction over the suit. *Id.* at 15 (expressly "notic[ing]," for the federal Court and Leafwell, MFG's "intent to refile" the same claims against Leafwell "in Florida state court").

96.     Moreover, MFG noted that it was doing so "prior to any ruling on the OSC." *Id.* Indeed, on November 11, 2025 and November 12, 2025, Castro told Counsel for Leafwell that the U.S. District Court for the Middle District of Florida now lacked jurisdiction over MFG in connection with the scope of potential sanctions.

97.     And then MFG did just that. On November 10, 2025, MFG filed a Notice of Voluntary Dismissal (*id.*, D.E. 31).

98.     And yet, from November 11, 2025 onward, Castro continued to email Leafwell's counsel threatening that MFG would be filing suit again against Leafwell, Leafwell's leadership team, and various dispensaries. Through Castro, MFG indeed used these threats against Leafwell in furtherance of its continuing campaign to use the AI-generated complaint, and/or threat thereof, to force (and/or extort) Leafwell to alter its business with the ultimate objective of shutting it down.

### G. **The Court's November 26, 2025 Opinion and Order**

99.     On November 26, 2025, the Court issued its Opinion and Order regarding its Order to Show Cause. *Id.*, D.E. 37.

100.    The Court reiterated that it "confirmed several of Defendant's claims about Plaintiff's dubious citations" prior to issuing the Order to Show Cause (*id.* at 3), and that the TRO Motion "contained fabricated citations, citations that do not contain quoted language, and citations that do not relate to the purported proposition." *Id.* at 7.

101.    The Court also stated that "[r]ather than take responsibility for the legal inaccuracies permeating his Motion for TRO, Mr. Castro's response to the Order to Show Cause is as colossal a collection of excuses and projection as the Court has seen in 25 years on the bench." *Id.* at 7-8. MFG's (in-house) counsel took "no responsibility for his actions," and – true to form – turned an "unconvincing" defense into a "blustering offense." *See id.* at 11. The Court further stated that Castro's accusations that Leafwell's counsel was in violation of the Florida Rules of Professional Conduct were "baseless[]" and would not be "entertain[ed]." *Id.*

102.    Thus, the Court rejected all of the bluff and bluster that MFG's counsel advanced, and once again saw the writing on the wall: Castro's "reckless use of AI" explained the situation. *Id.* at 11.

103.    Per the Court, "leniency [was] not the order the day" because of the situation MFG's in-house counsel created. *See id.* at 10. Castro's misrepresentations and refusal to take responsibility "require[d] strong sanctions." Id. at 13.

104.    Therefore, as a starting point, the Court ordered Castro to pay Leafwell's fees and costs incurred in responding to the TRO Motion (as well as in compiling the fee application that would follow). *Id.* at 13.

105.    The Court also ordered Castro to: attach the Opinion and Order to any case he files or removes to the Middle District of Florida during the next two (2) years; attend an in-person continuing legal education on the ethical use of AI; send a copy of the Opinion and Order to Garulay, and then file a notarized affidavit executed by Garulay confirming that Garulay did, in fact, read it. *Id.* at 14-15. Further, Castro was referred to the Florida Bar for appropriate discipline, and the Clerk was directed to transmit the entire record of the Federal Court Action to the Florida Bar. *Id.* at 15.

106.    Despite the conduct of its in-house counsel, MFG was not sanctioned and maintains the ability to continue to harass Leafwell by filing a new action. *See id.* at 13. But the record that had developed during "unusual" and "rapid" developments in the case (*see id.* at 6) did not accurately reflect Castro's position within MFG, the totality of MFG and Garulay's conduct, and the harm that they inflicted on Leafwell.

107.    And once MFG filed its Notice of Dismissal, per the Court, it was effectively "deprived of jurisdiction over the merits of the case." *Id.* at 4. This rendered all pending motions moot. *See id.* at 15-16. Including Leafwell's request to expand its sanctions to include MFG, too.

108.    Leafwell incurred a substantial amount of attorneys' fees in costs in defense of a lawsuit brought for the hidden purpose of shutting the company down. Based on the conduct of MFG's employees and leadership, Leafwell expended substantial resources defending against MFG's legal arguments hallucinated by artificial intelligence, MFG's purported evidence that did not exist, MFG's "Verified Complaint" that contained blatant falsities as per its own exhibits, MFG's repeated efforts to extort commercial information from Leafwell, and MFG's attempts to bring the company down in the marketplace in order to gain competitive advantage over Leafwell.

### H. Castro's Prior Efforts To Evade Sanctions, and MFG's Knowledge of Castro's Prior Sanctions

109.    Leafwell recently learned that Castro has a history of attempting to avoid court-ordered sanctions against him. Due to the "unusual, rapid procedural development" in the Federal Court Action ( *id.* at 6), this information was not part of the record in the Federal Court Action because it had not been discovered prior to the day that the Court filed its Order to Show Cause.

110.    On December 4, 2023, Judge Kyle Cohen of Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida entered two sanctions orders against Castro: one for Castro's severe deposition misconduct and one for **fabricating allegations in a complaint.** *See William P. Lindemann v. Andrea Balsamo et al.*, Case No. 2020-CA-004033 (Collier County, FL Cir. Ct.). These sanctions orders are attached hereto as **Exhibit E**. Notably, the court wrote that the evidence

established that certain allegations in Castro's complaint were both "factually incorrect" and "appear to have been *imagined* by Attorney Castro." The court ruled that Castro was personally responsible for paying opposing counsel's attorneys' fees and costs and expressly "reserve[d] on the amount of those attorney's fees and costs." On May 17, 2024, the court entered the fee award, "awarding attorneys' fees and costs against Jason Kenneth Castro as a sanction." This fee order is attached hereto as **Exhibit F.**

111.   On April 1, 2024, in the interim between being sanctioned and the amount of attorneys' fees still pending in the *Lindemann* action, Castro filed for Chapter 7 bankruptcy in the Western District of Pennsylvania. *See generally In Re. Jason K. Castro*, United States Bankruptcy Court, Pennsylvania Western, No. 24-bk-20769 (the "Bankruptcy Action"). A copy of Castro's petition (Bankruptcy Action, D.E. 8) is attached hereto as **Exhibit G**.

112.   In his petition, Castro listed his employer as The Doc App, Inc. – the same party that is, for purposes of this action and the pertinent events, doing business as MFG. Ex. G at 23.

113.   The creditors listed on Castro's petition included multiple Florida law firms, multiple Florida attorneys, Andrea Balsamo and her counsel, Judge Kyle Cohen, the Collier County Clerk of Courts, and the Florida Bar. *See id.*, 15-19. All such creditors, no doubt, are evidence of the fact that Castro took such action in order to avoid paying court-ordered sanctions.

114.    Garulay, as MFG's CEO, knew or should have known of Castro's history of taking measures to avoid fulfilling sanctions, such as filing for bankruptcy. Castro stated on his petition that he was employed by Garulay's company at the time; or, at the very least, was required to inquire of Castro given his status as MFG's in-house counsel.

115.    The Bankruptcy Court discharged Castro's debt on July 31, 2025, and the matter was closed on August 29, 2024. Bankruptcy Action, D.E. 15 & 18. It is not clear whether Castro ever paid any of the monetary sanctions that had been ordered against him, although, based on the trustee's July 30, 2024 report (*id.*, D.E 13), it appears that Castro was not required to pay his debts: "Claims Scheduled: $828318.92, Claims Asserted: Not Applicable, Claims scheduled to be discharged without payment (without deducting the value of collateral or debts excepted from discharge): $828318.92."

116.    Separately, MFG had actual knowledge that Castro has engaged in sanctionable conduct in the past. Castro has represented MFG in at least one other case, wherein Castro was sanctioned for missing a court conference and "needlessly wasting" the Court and parties' time. *See* *Alter Business Advisors, LLC v. The Doc App, Inc. et al.*, U.S. District Court, M.D. Florida, Case No. 2:23-cv-715-JLB-KCD, D.E. 27.

## COUNT I

### Declaratory Relief Pursuant to 28 U.S.C. § 2201

*Declaration that as his employer, MFG (and by extension the Doc App, Inc.) is vicariously liable for Castro's conduct, and thus for the monetary sanction that has been imposed.*

117.   Leafwell repeats and incorporates Paragraphs 1 through 116 as if fully set forth herein.

118.   Castro is MFG's in-house counsel and employee.

119.   MFG publicizes Castro as its corporate in-house counsel on its website. Castro also appears on MFG letterhead identifying him as "IHC" or "Inhouse Counsel." In addition, Castro stated in bankruptcy filings that he is employed by MFG.

120.   At all relevant times, Castro worked under the direction and control of MFG and its CEO, Garulay.

121.   In addition, at all relevant times, MFG, through Garulay, acted in a manner demonstrating their knowledge of MFG's allegations and the planned course of conduct, by, for example, signing notarized affidavits under penalty of perjury that were attached to the Verified Complaint. MFG, through Garulay, and Castro orchestrated a scheme to extort business information from Leafwell and ruin its business – to the benefit of MFG and the detriment of Leafwell – through oppressive litigation and conduct grounded thereupon.

122.   Throughout, MFG itself was a knowledgeable, enthusiastic, and active participant in the litigation and events surrounding it – as evidenced by the posting of multiple articles to its website and its Facebook posts discussing the lawsuit.

123.    Garulay, as the CEO, was a knowledgeable, enthusiastic, and active participant in the litigation and events surrounding it as evidenced by his commenting about the lawsuit on Facebook; his interview with a local news channel; his public threats to refer Leafwell to Florida state agencies; his public threat to "take the business down"; and his endorsement of affidavits, among other things.

124.    Castro has been sanctioned in the past, including for fabricating allegations.

125.    MFG also knew that Castro has been sanctioned for conduct, given that it happened in a case involving the parties.

126.    Additionally, Castro has a history of taking measures to avoid fulfilling sanctions, such as bankruptcy proceedings; this is something that Garulay, as MFG's CEO, necessarily knew or should have known.

127.    Evidently, leveraging his knowledge and experience with avoiding sanctions in the past, Castro took preemptive steps purposed upon insulating his employer, MFG, from any potential fall-out from his misconduct (likely that might result from his unabashed and reckless use of AI, among other things). In doing so, Castro knowingly misled the Court regarding his relationship with MFG.

128.    Specifically: Castro's pleadings in the Federal Court Action identified his position as MFG's counsel in his signature block for the deliberate purpose of misleading the Court that he was nothing other than outside counsel. *See e.g.*, Federal Court Action, D.E. 17 at 23.

129.    The Court in the Federal Court Action has already determined that Leafwell is entitled to its fees and costs incurred in connection with opposing MFG's TRO Motion. Because of the record in the Federal Court Action, this payment is to come from Castro.

130.    However, Castro filed a Notice of Voluntary Dismissal in the Federal Court Action, which, upon information and belief, was done in an effort to minimize the scope and/or impact of sanctions against him altogether; and, per his own admission, enable him to simply re-file the same lawsuit against Leafwell in state court.

131.    And, due to Castro's history of failing to pay and then employing techniques to evade sanctions, a substantial likelihood and present controversy exists that Castro will not pay any amounts.

132.    As a result, a present controversy and substantial likelihood exists that Castro concealed his position as in-house counsel for MFG in order to insulate the company from any sanctions orders.

133.    Additionally, a present controversy and substantial likelihood exists that Castro will attempt to evade any sanctions award entered by the United States Middle District of Florida.

134.    Additionally, a present controversy exists as to whether – under the doctrine of respondeat superior – MFG should be deemed vicariously liable, and thus ultimately responsible, for paying the attorney-fee sanctions that Castro has been ordered to pay.

135.    In addition, and based on Castro's conduct to the Court, a present controversy and substantial likelihood exists that Castro concealed his position as in-house counsel for MFG in order to insulate the company from any sanctions orders.

136.    And ultimately, for all of the reasons previously stated, although Castro was ordered to pay the sanctions, MFG – as his employer – should ultimately be deemed responsible for paying them.

**WHEREFORE**, Leafwell respectfully requests that this Court issue a declaration, declaring that:

a)  MFG is vicariously liable for Castro's conduct on its behalf in relevant part under the doctrine of *respondeat superior* and applicable principles, and MFG is therefore obligated to answer for Castro's conduct because Castro was its employee, acting under its authority and at its direction;

b)  For these reasons, MFG is liable to Leafwell for any and all of the sanctions levied against Castro, and Leafwell may accordingly enforce any sanctions judgment against MFG issued in the Federal Court Action; and

c)  Any other relief this Court deems just and proper.

## COUNT II
### Request for Pre-Filing Injunction Pending Satisfaction of Sanctions

145)    Leafwell repeats and incorporates Paragraphs 1 through 116 as if fully set forth herein.

146)    Federal courts have the inherent authority to protect their jurisdiction from conduct that impairs their ability to carry out their Article III functions.

Additionally, a litigant may be restricted as to what they may file and how they must behave, so long as they are not completely foreclosed from any access to the courts.[7]

147)    Moreover, District Courts may impose filing-related injunctions on future litigations arising from a fact or issue in a given case. Whether a pre-filing injunction is appropriate depends on the circumstances.

148)    Castro threatened both Leafwell and its executive staff on multiple occasions that state court litigation would be filed imminently. But as of the filing of this Complaint, MFG has not commenced renewed litigation in state court.

149)    At this point, MFG's litigation against Leafwell in this Court has already been vexatious and harassing – particularly in light of Castro's conduct towards Leafwell (and its counsel) and use of artificial intelligence to substantiate MFG's position.

150)    Leafwell has also incurred substantial attorneys' fees in defense of the State Court Action and Federal Court Action. Leafwell has also invested significant time and expense in the Federal Court Action.

151)    Moreover, MFG actively attempted to avoid sanctions from this Court by filing a Voluntary Notice of Dismissal. Therefore, any renewed litigation at this juncture is an attempt to evade this Court's sanctions, conceal its actions, and wipe the slate clean.

---

[7]    *See, e.g., Procup v. Strickland*, 792 F.2d 1069, 1073–74 (11th Cir. 1986); *Oliver v. Ameris Bank*, No. 21-13005, 2023 U.S. App. LEXIS 24999, at *7–8 (11th Cir. Sept. 21, 2023); *Harrelson v. United States*, 613 F.2d 114, 116 (5th Cir. 1980); *Shell v. U.S. Dept. of Hous. and Urban Dev.*, 355 F. App'x 300, 308–09 (11th Cir. 2009); *Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 300, n.3 (5th Cir. 2016).

152)    Based on Castro's history of evading sanctions, Leafwell also has strong reason to believe that he does not intend to timely fulfill the whole of his sanctions-related obligations.

153)    If MFG is permitted to freely file a new suit without its counsel satisfying on the ordered sanctions, the courts will be forced to expend additional time and expense on a case MFG willfully sidestepped, while Leafwell will be forced to incur even more substantial costs and time.

154)    No other adequate remedy is available to Leafwell because MFG has deprived the Court of jurisdiction through a Notice of Voluntary dismissal, and disavowed this Court's jurisdiction over it.

**WHEREFORE**, Leafwell respectfully requests that this Court issue an injunction preventing MFG from re-filing suit in any state or federal court:

    a)  Until Leafwell's attorneys' fees as ordered by this Court are paid in full;

    b)  Until all other sanctions ordered by this Court in its November 26, 2025 Opinion and Order have been satisfied;

    c)  Any other relief this Court deems just and proper.

## COUNT III
### Injunction Precluding MFG from Filing in State Court

145)    Leafwell repeats and incorporates Paragraphs 1 through 116 as if fully set forth herein.

146) Castro threatened both Leafwell and its executive staff on multiple occasions that MFG would be filing state court litigation against Leafwell imminently; and, per Castro, that lawsuit would be based on the same, similar, or overlapping subject matter as the Federal Court Action.

147) But as of the filing of this Complaint, MFG has not commenced renewed litigation in state court.

148) Based on the "first-to-file" doctrine[8] that is universally recognized in federal courts, *this* matter – stemming directly from the instant Complaint – is the first complaint filed based on the same, similar, or overlapping subject matter that is discussed herein (with the exception, of course, of the Federal Court Action, which is now closed).

**WHEREFORE,** Consistent with the law, Leafwell respectfully requests that this Court issue an injunction preventing MFG from filing suit against Leafwell in state court, arising from any similar or overlapping subject matter as the Federal Court Action. Put simply: Leafwell asks this Court to order MFG to comply with the law by refraining from filing a brand-new complaint in state court based on the same, similar, or overlapping subject matter as that of the lawsuit that arises from the instant Complaint.

---

[8] *See, e.g.*, *Gratuity Solutions, LLC v. Toast, Inc.*, No. 2:24-cv-737-JLB-NPM, 2025 LX 167464, at *4 (M.D. Fla. Apr. 7, 2025).

## COUNT III
### Abuse of Process

145)    Leafwell repeats and incorporates Paragraphs 1 through 116 as if fully set forth herein.

146)    MFG initiated the State Court Action under the premise that it wanted to stop Leafwell's purportedly "unlawful practices."

147)    However, MFG deliberately and intentionally misused the legal process for the improper purpose of extorting Leafwell for information and ruining its business entirely, all for MFG's benefit. MFG, through Garulay, worked in tandem with Castro to facilitate a scheme of oppressive litigation to accomplish this goal.

148)    Upon information and belief, MFG, through its in-house counsel, constructed legal theories, pleadings and arguments using artificial intelligence in order to manufacture seemingly forceful litigation against Leafwell. And, once MFG got caught, and realized that the Court was on the verge of discovering that the whole complaint was recklessly generated by AI, it immediately withdrew the action in order to avoid the full scope of sanctions.

149)    In turn, Castro, as MFG's in-house counsel, repeatedly used the State and Federal Court Actions as leverage to attempt to extort Leafwell's confidential business information outside of the judicial process and without protection from further disclosure. This is evidenced by Castro's repeated demands that Leafwell produce business information that was unconnected with MFG's stated complaint – under the guise of a C&D Demand and meet-and-confers.

150)   For example, MFG's C&D Letter demanded that Leafwell provide an assortment of information to MFG or face a civil action. Once litigation commenced, Castro repeatedly demanded confidential information from Leafwell – that it would then use to further its own ends against Leafwell and others – under the pretext of meet and confers, without observing the formality of the judicial process that MFG initiated.

151)   Additionally, on numerous occasions Castro, as MFG's in-house counsel, used the lawsuit (or threat of lawsuit) to threaten Leafwell's competitors as a means to get Leafwell to fold and/or significantly alter its business practices.

152)   On information and belief, and consistent with information conveyed via MFG's filings in the state court action, its goal in doing so was to harm Leafwell's ability to maintain clients, and get more clients, so that they would work with MFG instead.

153)   Further, MFG, Garulay, and Castro commenced a media campaign. For example, MFG published an article titled "How My Florida Green Protects Patients While Leafwell Undermines Trust," which relied only on its own untenable allegations.

154)   Upon information and belief, MFG intended to use its fabricated legal position as a means to improperly siphon off Leafwell's customer base, damage its marketplace standing, and destroy its goodwill.

155)   Moreover, MFG's true intention for the State Court Action (and later Federal Court Action) was to remove Leafwell as a competitor in the marketplace

entirely, as evidenced by his declarations that he would "take the business down" and "[t]hese people are going down, and hard!"

156)    Meanwhile, MFG, through its own in-house counsel, fabricated case law to support its legal theories. Indeed, and indisputably, MFG's in-house counsel used artificial intelligence without proper vetting for its TRO Motion, which has also been acknowledged by the Court. *See* D.E. 37 (Opinion and Order).

157)    Upon information and belief, the purpose of this was to further drain Leafwell's resources thereby impairing the business's ability to operate.

158)    The impropriety of MFG's theories, allegations, and litigation – likely driven largely by AI hallucinations – is only confirmed by the fact that, when faced with the prospect of sanctions, MFG immediately voluntarily dismissed the entire case. This, the State and Federal Court Actions served no other purpose than to extort and/or ruin Leafwell.

159)    As a result of all of this, Leafwell has suffered substantial damage and harm, including but not limited to: substantial attorneys' fees and costs exceeding $75,000 in defense of MFG's Verified Complaint and the Federal Court Action; loss of good will; and other amounts to be proven at trial.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

a)  All attorneys' fees incurred in the State Court Action and Federal Court Action, minus those actually paid pursuant to the November 26, 2025 Opinion and Order;

b) Any and all other damages, to be subsequently determined, stemming from harm to Leafwell's goodwill, business, and customer base, that resulted from MFG's conduct and campaign that were grounded on the AI-generated complaint and the resulting action;

c) Any other relief this Court deems just and proper.

## COUNT IV
### Negligent Supervision of Castro

160) Leafwell repeats and incorporates Paragraphs 1 through 116 as if fully set forth herein.

161) Castro and MFG were in an employer-employee relationship, with Castro acting as MFG's acknowledged in-house counsel. As such, MFG had a duty to supervise Castro's conduct to ensure that he was fit for the role and would not engage in tortious or sanctionable conduct through his position as the company's attorney.

162) In fact, MFG knew that Castro has engaged in sanctionable conduct in the past. Castro has represented MFG in at least one other case, wherein Castro was sanctioned for missing a court conference and "needlessly wasting" the Court and parties' time. *See Alter Business Advisors, LLC v. The Doc App, Inc. et al.*, U.S. District Court, M.D. Florida, Case No. 2:23-cv-715-JLB-KCD, D.E. 27.

163) Because MFG employed Castro as its in-house counsel, it also knew or should have known about Castro's past history of court-ordered sanctions – including any instance of fabricating allegations.

164)    MFG negligently breached that duty by failing to prevent Castro from continuing to engage in sanctionable behavior, such as fabricating case law leading to the imposition of sanctions. *See* Federal Court Action, D.E. 37 (Opinion and Order).

165)    Moreover, MFG breached its duty to supervise Castro by ensuring that he would refrain from using existing judicial process to extort confidential information from Leafwell, as described above.

166)    As a result of MFG's failure to adequately supervise Castro and his conduct, Leafwell has suffered damage in the form of attorneys' fees, lost economic opportunities, and lost goodwill.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

a)    All attorneys' fees incurred in the State Court Action and Federal Court Action, minus those actually paid pursuant to the November 26, 2025 Opinion and Order;

b)    Any and all other damages to be subsequently determined, including actual and consequential damages, stemming from harm to Leafwell's goodwill, business, and customer base, that resulted from MFG's conduct and campaign that were grounded on the AI-generated complaint and the resulting action;

c)    Any other relief this Court deems just and proper.

## COUNT V
### Tortious Interference With Current Business, Prospective Economic, and/or Contractual Relationships

167)    Leafwell repeats and incorporates Paragraphs 1 through 116 as if fully set forth herein.

168)    MFG's intentional conduct described herein had the overarching impact, and was indeed admittedly purposed upon, harming Leafwell's economic advantage over its competitor, MFG. It did so through a deliberate and multi-step scheme intended to destroy current client relationships, destroy potential client relationships, and to destroy relationships with the third parties with which it collaborates to provide services to its clients. Leafwell was indeed economically damaged by all of this conduct. And of course, MFG was aware of all such relationships when it took the steps described herein.

169)    Leafwell is a telehealth platform that assists patients with obtaining medical marijuana cards. In fact, Leafwell publicly holds itself out as working with a network of doctors on its website.

170)    Leafwell has lost existing and prospective economic relationships as a result of MFG's conduct, in addition to that of its CEO.

171)    In the course of its business, Leafwell collaborates, and has relationships with physicians, medical providers, and other third-party entities for varying purposes and functions. Insofar as contracts are involved in whole or in part, many of them are at will.

172)   On information and belief, MFG was aware that these contracts and agreements with Leafwell were in place, evidenced by MFG's cease and desist demands to dispensaries and other companies via email on September 30, 2025, copying Leafwell.

173)   After MFG initiated the State Court Action, it went on an aggressive public media campaign against Leafwell, premised on the allegations in its own Verified Complaint.

174)   Prior to September 19, 2025, Leafwell had an independent contractor agreement with a specific physician to help Florida patients obtain access to medical marijuana certifications through Leafwell. Because this was part of Leafwell's business, it expected that the relationship would continue.

175)   On September 19, 2025, this provider submitted a resignation letter to Leafwell, stating "I have recently been made aware of serious legal concerns regarding participation in dispensary-subsidized events in Florida." The resignation letter continued by parroting the public allegations made by MFG against Leafwell.

176)   This physician stated that "[w]hile I have not personally received legal notice, my awareness of these industry-wide risks creates an untenable situation." As a result, the physician terminated the independent contractor agreement.

177)   Through its substantial public media campaign, undertaken without justification or excuse, MFG intended to cause physician(s) such as this one to sever their relationships with Leafwell. This was only amplified by MFG's conduct in the Federal Court Action.

178)    In fact, at least one other physician working under an agreement also resigned from Leafwell; on information and belief, such resignation was the direct result of MFG's conduct.

179)    In addition, MFG's CEO attended an in-person Leafwell event on October 3, 2025. While there, Garulay created a massive disturbance, was disruptive, and acted in a threatening manner – all without any justification or excuse.

180)    All public participants at this event (including Garulay) registered in advance with Leafwell before attending.

181)    Because of this, Leafwell had the expectation that if a patient was certified for a medical marijuana card, they would continue to transact with Leafwell for services. Garulay knew this because his company provides similar services through a similar means.

182)    Upon information and belief, Garulay's massive outburst caused prospective patients to leave the event, and therefore not engage in business with Leafwell.

183)    Additionally, and more broadly, on information and belief, MFG's conduct that resulted in the loss of Leafwell's third-party co-collaborators detrimentally impacted Leafwell's ability to do its business. The effect of that, among other things, was the loss of current and/or prospective clients – and thus the revenue that would otherwise have been gained.

184)    Because of MFG and its CEO's conduct as described above, Leafwell has suffered damages in the form of lost profits, lost economic opportunities, and loss of goodwill in amounts to be proven at trial.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

    a) Its actual and consequential damages resulting from MFG's conduct;

    b) A permanent injunction, preventing MFG and its executives, officers, and employees from contacting or coming within 300 feet of any Leafwell event, facility, executive, officer, employee, or third-party entity collaborator (or an employee or officer thereof) with which MFG knows that Leafwell has a business relationship, or third-party individual collaborator with which MFG knows that Leafwell has a business relationship.

    c) Any other relief this Court deems just and proper.

## JURY DEMAND

Leafwell reserves the right to trial by jury on all counts so triable.

## PRAYER FOR RELIEF

Leafwell requests judgment and award against MFG for the following:

    a) Actual and consequential damages;

    b) Pre- and post-judgment interest at the highest rate allowed by law;

    c) All attorneys' fees incurred in responding to the Federal Court Action (albeit without redundancy as to those that have already been ordered);

    d) Injunctive relief as described herein; and

e) All other relief at law or in equity to which Leafwell may show itself
entitled.

Dated: December 6, 2025                     Respectfully submitted,

                                            **DLA PIPER LLP (US)**

                                            */s/ Jody Stafford*
                                            Jody Stafford Fernandez
                                            Florida Bar Number: 1015797
                                            jody.stafford@us.dlapiper.com
                                            DLA PIPER LLP (US)
                                            200 South Biscayne Boulevard
                                            Suite 2500
                                            Miami, Florida 33131
                                            Telephone: (305) 702-8890

                                            Paul B. Lewis, Esq. (motion for
                                            admission *pro hac vice* forthcoming)
                                            paul.lewis@us.dlapiper.com
                                            *Forthcoming Lead Counsel*
                                            Kevin M. Bergin, Esq. (motion for
                                            admission *pro hac vice* forthcoming)
                                            kevin.bergin@us.dlapiper.com
                                            DLA PIPER LLP (US)
                                            33 Arch Street, 26th Floor
                                            Boston, MA 02110
                                            Telephone: (617) 406-6000