UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Leafwell, Inc.,
a Delaware corporation,
   *Plaintiff*,

v.           Case No. 2:25-cv-01132-JES-DNF

The Doc App, Inc.
d/b/a My Florida Green,
a Florida corporation,
   *Defendant.*

_____

## AMENDED COMPLAINT

Now comes the Plaintiff, Leafwell, Inc. ("Leafwell" or "Plaintiff") and, by and through its undersigned counsel, and files this Amended Complaint against Defendant, The Doc App, Inc. d/b/a My Florida Green ("MFG" or "Defendant"). In support of the relief requested herein, Plaintiff hereby states as follows:

## I. INTRODUCTION

At some point in 2025, MFG recognized that its competitor, Leafwell, was finding great success in the industry that the two parties share; and, with a limited pool of clientele, MFG (by its own admission) was on the losing end of Leafwell's commercial success. So, as MFG's Chief Executive Officer ("CEO") put it, MFG concocted a plan to "take [Leafwell's] business down."

To that end, MFG's CEO and its "Inhouse Corporate Counsel" – together – recklessly directed an artificial intelligence ("AI") platform to concoct a "Verified Complaint," which they verified under the penalty of perjury and filed in the Circuit

1

Court in and for Lee County, Florida. Despite the many legal and factual deficiencies, inconsistencies, problems, lack of sufficient human vetting, and other issues with that AI-generated complaint, MFG weaponized that "Verified Complaint" – using the lawsuit as a mechanism of extorting Leafwell to serve its own ends.

Before Leafwell could react, MFG launched a multi-pronged attack during the weeks immediately following the filing of the "Verified Complaint," apparently hoping to batter Leafwell into submission. MFG's overarching goal was to improperly force Leafwell into substantially altering its own business practices, in a way that, in MFG's view, would effectively eviscerate Leafwell's ability to compete with MFG as it had been. Meanwhile, MFG continued to engage in such purportedly improper practices, itself.

With the "Verified Complaint" at its core, MFG's scheme included a media blitz, MFG's CEO personally causing a scene at a Leafwell event, threats and demands to Leafwell's third-party collaborators, and maligning Leafwell to its current and/or potential customers, among other things. MFG did find some initial success. As a direct result of MFG's actions, Leafwell's professional relationships were severed, current and/or prospective customers were lost, and Leafwell incurred substantial financial damage. And throughout all of this – by way of repeated communications from MFG's "Inhouse Corporate Counsel" – MFG endeavored to improperly extract confidential information from Leafwell, and to convince Leafwell to shut down its business so that the campaign and its recently-filed lawsuit would end.

But, as Leafwell soon discovered, MFG's lawsuit had a number of fundamental flaws. Indeed, upon removal of the "Verified Complaint" to the U.S. District Court for the Middle District of Florida, the Court observed areas of "serious concern" in the legal claims; for instance, as the Court noted, the two statutes on which MFG principally relied to allege liability against Leafwell do not afford a private right of action, with one such statute even being part of the criminal code. But even more egregious was MFG's reckless, rampant, and unabashed use of AI – in conjunction with the clear lack of any human vetting. One of MFG's filings contained a dozen hallucinated, fabricated, and/or completely unsupportive legal citations.

Due to MFG's hallucinated citations, the Court ordered MFG's In-House Counsel to show cause as to why he should not be sanctioned for his "numerous" misrepresentations to the Court. His response was to double down on MFG's position and ignore all responsibility. In fact, he continued on his crusade against Leafwell, contending that everyone but himself and MFG caused the issue. The Court found MFG's explanation to be "as colossal a collection of excuses and projection as the Court has seen in 25 years on the bench." *See* Case No. 2:25-cv-838-SPC-NPM (M.D. Fla.), D.E. 37 at 7–8. Ultimately, the Court determined severe sanctions on MFG's In-House Counsel were appropriate, and imposed them accordingly.

But, before that occurred, MFG unabashedly attempted to insulate itself from accountability for its own scheme and misconduct. The same evening that its In-House Counsel filed his response to the show cause order, MFG filed a self-executing notice of voluntary dismissal. MFG's stated reason for doing so was to bring another nearly

identical action against Leafwell in state court (by adding nominal Florida-based Defendants) – an action that MFG repeatedly stated was imminent, and, as of the filing of this Amended Complaint, has been filed. *See* Case No. 11-2025-CA-002981-0001-01 (Collier Cnty., FL Cir. Ct.), D.E. 3 (Complaint); *see also* Civil Action No. 2:25-cv-01231-KCD-DNF, U.S. Dist. Court for the Middle District of Florida, D.E. 1 (Leafwell's Notice of Removal). It appears that MFG has sought a mulligan and is now endeavoring to restart its severely discredited campaign against Leafwell.

Also relevant here is the reality that MFG was aware of its chosen In-House Counsel's proclivity for misconduct before the courts (and recent evidence suggests that such misconduct includes the potential fabrication of caselaw), as well as deliberate evasion of court-imposed sanctions. Indeed, MFG's chosen In-House Counsel has been sanctioned for fabricating legal claims in the past; however, public records establish that he was able to evade responsibility and payment by declaring bankruptcy (with the court and prior opposing counsel among the listed creditors in the bankruptcy petition). Here, MFG and its In-House Counsel are attempting to evade accountability once again, and ultimately leave Leafwell with nothing. Under these circumstances, MFG must be held vicariously liable and answer for its employee's conduct.

MFG, through its CEO, worked in tandem with its In-House Counsel to weaponize the judicial process to attempt to extort information and "take [Leafwell's] business down." Because of MFG's failed first attempt, Leafwell has incurred

significant legal fees, expenses, and other damages for a meaningless effort. MFG must be held responsible for this damage.

Even if MFG can escape scrutiny for its scheme once again, it nonetheless cannot shirk its obligation to supervise its employee's conduct – especially where it knew or should have known of its Counsel's sanctions history, and where (at the very least) MFG's non-lawyer CEO appears to had already harbored concern that its own In-House Counsel might fabricate caselaw at the time that MFG's materials were filed. Moreover, MFG's onslaught of self-serving press and its CEO's public outbursts independently caused Leafwell to lose business relationships and prospects, damaging Leafwell even further.

Leafwell must be made whole for the damage MFG has done.

## II. <u>THE PARTIES</u>

1.     Defendant, MFG, is a Florida corporation with its principal place of business in Naples, Florida.

2.     Plaintiff, Leafwell, is a Delaware corporation registered to do business in the State of Florida and dozens of other states.

3.     Leafwell is a telehealth platform with its leadership spread throughout the United States and Europe.

4.     Leafwell's Chief Executive Officer is located in the United Kingdom; Leafwell's Chief of Staff is located in the United Kingdom; Leafwell's Chief Operating Officer is located in Virginia; Leafwell's Marketing Director is located in Texas;

Leafwell's Head of People is located in Illinois; and Leafwell's lead Product Manager is located in North Carolina.

5.    Separately, public information indicates that Leafwell's corporate headquarters is located at 3680 Wilshire Blvd., Los Angeles, California, 90010.

6.    Leafwell conducts in-person board meetings in the United Kingdom, Virginia, and Pennsylvania, and has never conducted a board meeting in Florida.

7.    The execution of Leafwell's technology development is performed by contractors in Portugal and Romania.

8.    Leafwell maintains its corporate bank account with an online banking platform which does not have physical branches. Payments to Leafwell's creditors originate from this online bank account.

9.    Leafwell's principal place of business is not in Florida. No person on Leafwell's executive leadership team is located in Florida.  No person on Leafwell's leadership team maintains an office at, or otherwise conducts business at, any Florida address.

### III.    JURSIDICTION AND VENUE

10.    The Court has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000 dollars, exclusive of interest and costs.[1]

---

[1]    *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 n.2 (11th Cir. 2005) ("[A] corporation's citizenship by virtue of its principal place of business need not be conclusively determined to satisfy § 1332 provided the party asserting the claim demonstrates diversity by conclusively establishing the corporation's citizenship by virtue of its State of incorporation and by

11.     Additionally and independently, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because at least one claim in this action concerns the interpretation and/or enforcement of order(s) that the U.S. District Court for the Middle District of Florida issued.

12.     This Court has personal jurisdiction over the MFG because it conducts, and continues to conduct, business within the State of Florida. MFG is a Florida-domiciled business with a principal place of business in Naples, Florida, and otherwise has voluntarily submitted to the jurisdiction of Florida Courts.

13.     Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because the Defendant (MFG) is a resident of this District, and all or a substantial part of the events or omissions from which Leafwell's claims arise occurred in this District.

## IV.    BACKGROUND

14.     Leafwell is a telehealth platform that assists patients with, *inter alia*, obtaining medical marijuana certifications. Leafwell's mission is to make treatment easier, more affordable, and more accessible for patients.

15.     Upon information and belief, MFG is a Florida-based provider of services connecting patients with physicians for purposes of obtaining Florida medical marijuana certifications.

---

demonstrating that the corporation's PPB is not in a State which would destroy complete diversity."); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 741–42 (1980) (explaining that diversity jurisdiction existed when one party was from Oklahoma and the other party's principal place of business was "in a state other than Oklahoma").

16.     At all relevant times, Nicholas Garulay ("Garulay") was, and continues to be, MFG's founder and Chief Executive Officer.

17.     At all relevant times, and at least as of the date that the instant Amended Complaint was filed, Jason K. Castro, Esq. ("Castro") was, and continues to be, MFG's (only) in-house legal Counsel. In fact, MFG's website[2] publicly holds Castro out as its "In-House Corporate Counsel."

18.     Upon information and belief, Castro receives a salary from MFG for his role as the company's In-House Counsel.

19.     At some point in early 2025, MFG came to believe that Leafwell – its apparent competitor – was the cause of its own declining revenues and popularity with current and potential clientele. According to its public filings, MFG apparently believed itself entitled to the entire population of the State of Florida as clients, and felt that Leafwell was encroaching on its territory in that respect.

**A. The Cease and Desist Demand Letter**

20.     Thus, on or about August 22, 2025, MFG sent Leafwell correspondence constituting a demand letter (the "C&D Demand") via certified mail to Leafwell's registered agent in Florida. A true and accurate copy of the C&D Demand is attached hereto as **Exhibit A**.

21.     The C&D Demand was authored by Castro, and his signature block noted his role as MFG's "Inhouse Counsel." Ex. A at 5. In addition, the C&D

---

[2]     https://myfloridagreen.com/team-member/jason-k-castro-esq/ (last visited Jan. 26, 2026).

Demand was written on MFG's letterhead, which included "Jason Castro, IHC" on the very first page. *Id.* at 1.

22.    Despite MFG's status as a private, non-governmental entity, the C&D Demand alleged to be "formal notice" that Leafwell was "actively engaged in business practices [ ] that violate multiple provisions of Florida law." *Id.* at 1.

23.    In sum, MFG's C&D Demand alleged that Leafwell's "free medical marijuana certification events," at which Leafwell provided "cost-free" medical marijuana certification to patients, violated Fla. Stat. § 817.505 (the "Patient Brokering Act," which is part of Florida Statutes Title XLVI, Crimes) and Fla. Stat. § 381.986 (the "Medical Use of Marijuana Act").[3] *Id.* at 1-2. However, as a matter of law (and as the U.S. District Court for the Middle District of Florida noted several months later), neither of these statutes allow a private entity like MFG to sue another private entity to enforce them.

24.    The C&D Demand went on to allege that Leafwell was "actively organizing and executing mass 'free medical marijuana certification' events," which "constitute[d] a commercial scheme designed to induce patient flow" to medical marijuana treatment centers ("MMTCs"). *Id.* at 1-2.

25.    Premising its C&D Demand on Leafwell's supposed violation of these two laws that lack any private right of action or enforcement, MFG contended that

---

[3]    Initially, MFG's allegations rested on § 381.986(1)(h) – which is the definition of "marijuana delivery device." *See* Ex. A. Later, MFG reverted to relying on § 381.986(3)(b).

Leafwell's alleged conduct was "actionable under multiple statutory and common law theories." *Id.* at 2.

26.    In the C&D Demand, MFG, through Castro as its In-House Counsel, stated that MFG was "preparing a civil complaint," apparently in order to enforce these laws against Leafwell. *See id.* at 3.

27.    In addition, the C&D Demand demanded that Leafwell, within five (5) business days, comply with the following: (i) alter its business practices; (ii) provide MFG with "[t]he names and NPI numbers of all Florida physicians certifying patients" with Leafwell; (iii) provide MFG with "[a]ll financial relationships and referral agreements between Leafwell and Florida MMTCs"; (iv) provide MFG with the "number and location of Florida-based 'free-certification' events" for the past year; and (v) provide MFG with "[a]ny written agreements or contracts with dispensaries or marketing firms related to patient acquisition." *Id.* at 4.

28.    Thus, MFG demanded that Leafwell (its competitor) disclose aspects of its business far beyond its alleged complaint of "free certification programs" – under the threat of commencing civil litigation against Leafwell.

29.    Indeed, per MFG, Leafwell's noncompliance with these demands would "result in immediate initiation of civil litigation." *Id.* MFG wanted to control the entire clientele population of Florida, and had apparently decided Leafwell was at fault for its declining revenue and position.

30.    Leafwell declined to respond to the C&D Demand. Leafwell also did not provide any of the information MFG demanded.

10

B. <u>**The First Florida State Court Action**</u>

31.    On September 3, 2025, MFG filed a complaint in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida (the "First State Court Action"), styled *The Doc App, Inc. d/b/a My Florida Green v. Leafwell, Inc.*, Case No. 25-CA-4788, which it then amended on September 15, 2025.

32.    Specifically, the September 15, 2025 filing was a Verified Complaint for Injunctive Relief and Damages (the "Verified Complaint"), a true and accurate copy of which is attached hereto as **Exhibit B**.

33.    Page 19 of the Verified Complaint contained the following verification, under "penalty of perjury":

> **VERIFICATION:** Pursuant to Fla. Stat. §92.525, the plaintiff declares under penalty of perjury that the factual allegations in this Verified Complaint are true and correct. (See Attached as **Exhibit P1, P2, P3**.)

34.    Castro signed the Verified Complaint as Counsel. Exhibits P-1 and P-2 to the Verified Complaint were affidavits from Garulay, signed before a notary public in the State of Florida. Ex. B at 50-52, 55.

35.    MFG contended that Leafwell's practices were somehow deceptive to patients because Leafwell advertised "free" medical marijuana certifications without disclosing that the service was being paid for by a third party instead of the patients. *See id.* at 5, ⁋ 8.

36.    Based on this position, MFG asserted claims for: Violation of Fla. Stat. § 501.204 (Count I), Tortious Interference with Business Relationships (Count II),

Unjust Enrichment (Count III), Civil Conspiracy (Count IV), and Declaratory and Injunctive Relief (Count V). *See id.* at 10-18.

37.     However, MFG's Verified Complaint displayed numerous concerning deficiencies – both in its allegations and references to evidence. For example, neither the Patient Brokering Act nor Fla. Stat. § 381.986(3)(b) afford a private right of action. The federal court's later November 6, 2025 Order to Show Cause[4] and its November 26, 2025 Opinion and Order[5] expressly noted that some of these issues constituted areas of "serious concern."

38.     But those are only a few examples. MFG's Unjust Enrichment claim (Count III) did not allege that MFG conferred any direct benefit onto Leafwell – meaning the entire claim was facially insufficient. *See* Ex. B at 11-12.

39.     Additionally, Exhibit P-2 was an "Attorney Certification Pursuant To Rule 1.610 Certification of Counsel Regarding Notice." *Id.* at 53-54. Strangely, this was not signed by Castro (MFG's In-House Counsel and litigator); instead, the notary block indicates that it was endorsed by Garulay, although it lacks his signature. *See id.* at 54. Upon information and belief, Garulay is not an attorney in the State of Florida.

40.     The "Verified Complaint" (signed under penalty of perjury) also relied upon, and expressly attested to, the presence of a number of quotes and other propositions from within the exhibits that were appended to it. However, in multiple

---

[4]     *The Doc App, Inc. v. Leafwell, Inc.*, No. 2:25-cv-838-SPC-NPM, D.E. 25 at 2 (M.D. Fla.).
[5]     *Id.* at D.E. 37.

instances, the exhibits themselves did not contain anything remotely resembling the quotes or proposition(s) for which they were cited.

41.    As just one of many examples: MFG contended that exhibit B to the Verified Complaint – Leafwell's own social media post – itself said that the free certification events were "tied to commercial arrangements and marketing incentives[.]" *Id.* at ¶ 8. Clearly, the exhibit does not say this. *See id.* at 21

42.    And, other key "Verified" allegations were plainly contradicted by MFG's own exhibits. For instance: MFG alleged that exhibit A to its Verified Complaint was advertising "'free' medical marijuana certifications." *Id.* at ¶ 8. But exhibit A was a social media post about Leafwell's membership program – which costs $9.99 per month, as the exhibit unambiguously demonstrated. *See id.* at 20.

43.    Upon information and belief, MFG, through its In-House Counsel, used AI to fabricate its legal theories and craft its allegations out of whole cloth, as reflected by the pleading's circular logic and incongruencies and its "formulaic, singsong manner—seemingly lifelike on the surface, yet devoid of much substantive legal argument on the merits—the tell-tale hallmarks of generative AI work product." *See O'Brien v. Flick*, No. 24-61529-CIV, 2025 U.S. Dist. LEXIS 10625, at *14 n.5 (S.D. Fla. Jan. 10, 2025). And notably, to that point, MFG later expressly admitted to Leafwell's Counsel – in writing, by and through Castro – to relying upon AI for drafting legal filings.

44.    In fact, MFG's chief allegation – that doctors were directly referring patients to on-site dispensaries at Leafwell's events – is not even possible under

13

Florida's medical marijuana statutes and regulations. Under Florida law, all patients are required to have a "valid Medical Marijuana Use Registry identification card to obtain marijuana"/ purchase it from MMTCs. *See* Fla. Admin. Code R. 64-4.011(1); *see also* Fla. Stat. § 381.986(8)(e)16.d. To obtain an identification card, patients must submit an application (and payment) to the Office of Medical Marijuana Use ("OMMU") (*see* Fla. Admin. Code 64-4.011(2)) – which, on information and belief, takes, on average, ten business days to be approved. Moreover, on information and belief, no doctor working with Leafwell ever referred patients to specific dispensaries, nor recommended that patients go to any specific MMTC.

45.    Thus, basic due diligence reveals that even if patients were certified for medical marijuana at Leafwell's alleged free-certification events, patients could not purchase anything from dispensaries *until the OMMU approved their identification card days later.* Of course, MFG knew all of this because its own website tells customers that "[p]atients should expect a 10-14 day application processing time" for OMMU approval and, once received, patients can then "order from any approved dispensary."[6]

46.    Separate and apart from all of this, MFG also advertises free recertifications to a select population of its own clientele. In addition to the fact that this constitutes evidence of MFG's full awareness – contrary to its underlying theory – that Florida law does not require patients to directly pay any physician's fee, this also serves as further evidence that AI generated/hallucinated MFG's entire

---

[6]    https://myfloridagreen.com/faq/ (last visited Jan. 22, 2026).

underlying theory. In fact, MFG's own website actively promotes dispensaries all across the state of Florida, which MFG accuses Leafwell of wrongfully doing.[7]  Thus, it is apparent that MFG (by and through its CEO and In-House Counsel) utterly failed to vet its theory, or its AI-generated "Verified Complaint" more broadly, before (i) attesting to its allegations under the penalty of perjury then (ii) filing it and thus initiating the lawsuit against Leafwell, and then (iii) then resting its entire improper campaign against Leafwell upon the existence of such lawsuit.

47.    The same day MFG filed its Verified Complaint in the First State Court Action, it also filed an ex parte Emergency Motion for Temporary Injunction. However, despite the fact that MFG was aware of the identity of Leafwell's registered agent (since that is who MFG's C&D Demand was addressed to), MFG declined to take any steps to serve Leafwell's registered agent with its Verified Complaint or with its ex parte Emergency Motion for Temporary Injunction.

48.    Upon information and belief, MFG and its In-House Counsel deliberately chose not to serve Leafwell with the Verified Complaint or the ex parte motion for the specific purpose of concealing their actions from Leafwell, and in an effort to get immediate (unopposed) relief while exerting minimal cost and effort.

49.    However, before MFG could get its requested ex parte relief from the Florida state court, Leafwell discovered the First State Court Action. On September 19, 2025, Leafwell removed it to the United States District Court for the Middle

---

[7]    https://myfloridagreen.com/dispensaries/ (last visited Jan. 26, 2026).

District of Florida under Case No. 2:25-cv-838-SPC-NPM (the "First Federal Court Action").

C. **MFG's Media Campaign Against Leafwell**

50.     Shortly after initiating the First State Court Action, MFG went on a public media smear campaign against Leafwell in an apparent effort to weaponize its action that had been filed in the court(s) while avoiding any judicial scrutiny of its allegations – all in an effort to preemptively force Leafwell to fold under the intense and sudden pressure by capitulating to its extortive demands.

51.     For instance, MFG posted a September 18, 2025 press release on its website that was titled "How My Florida Green Protects Patients While Leafwell Undermines Trust." A true and accurate copy of this article is attached as **Exhibit C**. Capitalizing on the allegations in its Verified Complaint – which, upon information and belief, was recklessly created by unvetted artificial intelligence – it contended that "[Leafwell's] model puts sales first. . . [MFG's] puts patients first." Ex. C at 1.

52.     On September 12, 2025, MFG publicly posted on its Facebook page a press release caption "FOR IMMEDIATE RELEASE[.]"

53.     This post publicized MFG's lawsuit against Leafwell, stating "[t]he Complaint alleges that Leafwell, working with national dispensary chains, offered 'free' certifications subsidized by dispensaries – a practice that misleads patients and undermines physician independence[.]"

54.     This post also quotes Garulay as saying "[t]hese practices undermine the trust patients place in their physicians," among other things.

16

55.     Based on MFG's own self-created allegations, Garulay personally interacted with other users' comments, saying things like: "[t]his is a gimmick"; "[y]ou know the effort and money I've invested along with the time and sacrifice. I'm not sitting idle and watching this go down . . . "; and "[t]hese people are going down, and hard!"

56.     As an aside, despite MFG's efforts to convince the Florida government to prosecute Leafwell in order to gain a leg-up on its competition, Leafwell has never been contacted, subpoenaed, or charged by any of the pertinent Florida governmental authorities.

57.     On September 17, 2025, and again with heavy reference to its AI-generated Verified Complaint, MFG posted another article on its website titled, in part, "What Is Patient Brokering? How Leafwell's Practices Threaten Florida's Medical Cannabis Program." A true and accurate copy of this article is attached as **Exhibit D**.

58.     In one portion, this article stated that "[r]ecently, questions have been raised about Leafwell, a telehealth platform offering medical marijuana certifications. According to our [MFG's] Verified Complaint, Leafwell partnered with dispensaries to offer 'free' cannabis certifications at pop-up events." Of course, these purported "questions" had solely been raised by MFG via its AI-generated "Verified Complaint."

59.     MFG posted another article on its website on September 18, 2025, describing its lawsuit against Leafwell; therein, it feigned sincerity in its statement that

"[t]his lawsuit isn't about removing competition."[8] But again, MFG capitalized on its own AI-generated allegations that Leafwell was engaging in "[u]nlawful inducements," "[d]eceptive practices," and "[p]atient brokering schemes."[9]

60.    On September 19, 2025, MFG made another post on its Facebook page, which – again relying on its Verified Complaint against Leafwell – asserting that "Justice is coming" for Leafwell and all of the individuals and entities with which it collaborates. This article also contained a link to one of MFG's previous press releases published on its website.

61.    In addition, Castro is quoted in a September 23, 2025 Law.com article,[10] claiming that the Verified Complaint was filed to "protect[ ] patients."

62.    On or about October 10, 2025, Garulay also provided an interview for a local news station.[11] Among other things, he rested on MFG's filing of their complaint and said, "I'm not going to sit on my hands and watch a group like this [Leafwell] take over **and displace these people** that are suffering from debilitating conditions."[12] Of course, it is unclear from MFG's complaint how, precisely, any patients were being "displaced." And, on information and belief, no patients were actually being "displaced" as a result of Leafwell's conduct.

---

[8]    https://myfloridagreen.com/blog/leafwell-lawsuit-explained/ (last visited Jan. 22, 2026).
[9]    *Id.*
[10]    https://www.law.com/dailybusinessreview/2025/09/23/medical-marijuana-company-accuses-doctors-of-colluding-with-dispensaries-/ (Sept. 23, 2025).
[11]    https://www.gulfcoastnewsnow.com/article/naples-medical-marijuana-dispensary-kickbacks/69002675 (Oct. 10, 2025).
[12]    *Id.* (emphasis added).

63.     Upon information and belief, and given his course of conduct, Garulay contacted other news providers and platforms, leveraging MFG's AI-generated, unvetted Verified Complaint and the lawsuit that it created, in an attempt to cause Leafwell to lose customers and/or to ultimately pressure Leafwell into folding to MFG's extortive demands.

**D. <u>MFG's Continued Harassment of Leafwell</u>**

64.     On September 25, 2025, after Leafwell removed MFG's First State Court Action to federal court (*see* Case No. 2:25-cv-00838-SPC-NPM, D.E. 1), Castro emailed Leafwell's Counsel for a meet-and-confer regarding MFG's "forthcoming emergency motion for injunction and temporary protective order."

65.     In this same subject, Castro stated that "[o]ur position has already been reduced to writing in the filings, but I am willing to hear your client's position during our discussion."

66.     Shortly after this, on September 25, 2025, Castro again emailed Leafwell's Counsel saying "Plaintiff intends to move **aggressively** and seek immediate relief on the **TRO and preliminary injunction**" (emphasis in original).

67.     Castro's second email attempted to extract information from Leafwell's Counsel which, upon information and belief, he intended to use to MFG's benefit in the lawsuit (including a potential, and subsequently-threatened, amendment to include other third parties as defendants). In fact, per Castro, MFG wanted Leafwell to halt its business practices – regardless of dispensary involvement – *before* the court ruled on the threatened motion for temporary restraining order.

68.     That same evening, responding to Castro's email, Leafwell's Counsel suggested a call next week for the meet-and-confer. Castro never reverted to schedule a call, and instead declared on October 2, 2025 that MFG would be filing its Motion for TRO and Preliminary Injunction next day.

69.     Meanwhile, Castro sent no fewer than nine (9) cease and desist demands to dispensaries and other companies via email on September 30, 2025 – similar in sum and substance to what MFG used to first threaten Leafwell. Castro copied Leafwell's Counsel to these communications.

70.     This correspondence said, among other things, "Please be advised that our office represents **The Doc App, Inc. d/b/a My Florida Green**. A copy of the **Verified Complaint _currently_** [*sic*] **pending in federal court** is attached for your review. Litigation has already been initiated against Leafwell, Inc." (emphasis in original).

71.     This was, of course, yet another example of how MFG leveraged the existence of its lawsuit – that was created by its legally and factually deficient unvetted AI-generated complaint – to deliberately and improperly harm Leafwell's business.

72.     In his emails, Castro also stated that he copied Garulay (among others), specifically "to ensure the client is aware of all communications."

73.     Additionally, on October 3, 2025, Garulay went to a Leafwell event in St. Petersburg, FL.

74.     After sitting down with one of the providers, Garulay requested their name and length of time they had worked with Leafwell. Following this, Garulay

recorded the information on a printed cease and desist notice – which he gave to the provider. Garulay recorded this interaction.

75.    Upon information and belief, based on Garulay's conduct, this was another effort to detrimentally impact Leafwell's ongoing business, its contracted partners, and its economic prospects at the event.

76.    Garulay then created a massive scene at the event, acting in a disruptive and threatening manner. Garulay proclaimed that he would "take the business down," and directed similar comments towards others at the event. Garulay's conduct was, of course, designed to publicly disrupt Leafwell's operations and business, and prevent Leafwell from securing new clients at the event.

77.    Garulay was then asked to leave the event by onsite staff.

**E.** **MFG's Motion for TRO**

78.    On October 14, 2025, MFG filed a Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion for TRO") in the First Federal Court Action. No. 2:25-cv-838-SPC-NPM, D.E. 17.

79.    Castro later stated in a filing (*id.*, D.E. 48) that Garulay substantively reviewed the Motion for TRO and assisted with its filing in the First Federal Court Action. Specifically, Castro included Slack communications with his client that demonstrated that his client "reviewed the intended version of the TRO." *Id.* at 3. And the specific Slack message Castro sent to his client (which he attached as an exhibit to his filing (*see id.*, D.E. 48-2)) directed MFG (or Garulay) to do the following:



80.     Separately, the fact that there apparently was some sort of internal protocol whereby  Castro was to provide the cases he cited in legal memoranda to Garulay, a non-lawyer, so that Garulay could ensure that they exist and/or that they contain the cited quotes and propositions – further evidences Garulay's knowledge of the likelihood that his own In-House Counsel would provide the Court with AI-hallucinated citations within MFG's filings (likely because such a thing or similar thing has happened, or at least almost happened, in the past, as set forth in Paragraphs 133-141 below).

81.     But, on information and belief, despite this apparent internal protocol, (i) Castro did not actually provide all of the cases to which he cited (because a number of them did not exist), and (ii) Garulay never actually fulfilled such apparent protocol by taking steps to ensure that MFG's quotes, cases, and propositions within the filing actually existed.

82.     And, in addition to all of MFG's other misconduct (albeit perhaps not as egregious), it is now very evident that MFG (and its principal) were actively advancing its campaign against Leafwell on all possible fronts.

83.     Indeed, despite this exchange, in numerous places in its papers, MFG cited legal authority that did not exist, quoted cases that did not have the quoted

language, and misrepresented propositions of various decisions. *See generally id.*, D.E. 37.

84. Leafwell brought all of these matters to the Court's attention in its Opposition, which was filed on October 28, 2025. *Id.*, D.E. 19.

85. Also on October 28, 2025, Leafwell's Counsel emailed Castro for a meet-and-confer regarding a motion for sanctions given the false and fictitious case citations cited in MFG's TRO Motion.

86. Castro responded that same day admitting that he, and by extension, MFG, use "AI tools . . . to assist with drafting," but stated (among other things) that "all legal analysis and final language are human-authored and attorney-verified." In that email, on behalf of MFG, Castro claimed that every cited case was "reviewed for context, accuracy, and proper pin cites," "compared word-for-word to the official reporter" where needed, and Castro personally confirmed that all of his work "is valid and correctly characterized." Obviously, none of this was true.

87. Rather than engage with Leafwell's Counsel about a meet-and-confer regarding Leafwell's forthcoming motion for sanctions (required, of course, under the Local Rules), Castro instead characterized her request as "childish unsupported demands" and told her to "[d]o your job and draft a proper response."

88. In a later October 28, 2025 email, Castro again attempted to use the situation to leverage information out of Leafwell's Counsel that (on information and belief) it intended to subsequently use to its commercial benefit against Leafwell and/or others. Castro's email characterized Leafwell's analysis of his hallucinated

23

cases as "unfounded" and the meet-and-confer request as "threats/games." And, per Castro, if Leafwell "did not want to engage on the merits, [MFG would] respond accordingly before the Court. It's up to [Counsel] how [they] want to spend [their] time." And after the Court (eventually) reviewed that email and some of MFG's emails and court filings that followed, the Court stated its finding – that Castro had "baselessly accuse[d]" Leafwell's Counsel of violating the Florida Rules of Professional Conduct, "turn[ing] his unconvincing defense into blustering offense." *Id.*, D.E. 37 at 11 (November 26, 2025 Opinion and Order following initial Oder to Show Cause).

89.     Later, on October 28, 2025, MFG (by and through Castro) did acknowledge that there was an issue with his citations. However, it characterized that problem only as "a technical citation issue" – suggesting that Leafwell's Counsel was less than "competent" for suggesting otherwise, and that Leafwell's Counsel's approach was mere "rhetoric." Castro declared that MFG would file "an Amended Motion that supersedes the prior filing and contains only verified, properly cited authority."

90.     On October 29, 2025, Leafwell informed Castro via email correspondence that it did not consent to MFG's filing of an amended motion. This was, of course, because the Middle District of Florida's Local Rule 6.02(d) governing preliminary injunctions states "[n]o party may amend a motion or response without leave."

91.    Despite the aforementioned Local Rule, however, MFG did not move for leave. Instead, on October 30, 2025, MFG filed a Notice of Intent to File Amended Motion for Temporary Injunction (the "Notice"). *Id.*, D.E. 20.

92.    In its Notice, MFG misrepresented to the Court the reasons for the "amended motion"; MFG stated that it was withdrawing its original TRO Motion to file a renewed motion supported by "revised representations, corrected citations, additional legal support, and evidentiary support. . ." *Id.*, D.E. 20 at 1.

93.    The Notice also represented that Castro "has initiated conferral with [Leafwell's] counsel regarding the renewed motion and continues those discussions in good faith." *Id.* at 2.

94.    On November 5, 2025, the Court entered an Order withdrawing MFG's original TRO Motion "based on [D.E.] 20 Plaintiff's Notice of Intent" – which, again, did not accurately reflect Leafwell's position on MFG's Amended Motion. *See id.*, D.E. 21. Thus – like the rest of its conduct – MFG was able to effectively misrepresent what it was doing and conceal its true motive and intent (while also unabashedly violating applicable rules).

95.    On that same day, MFG filed its Amended Motion for Temporary Restraining Order and Preliminary Injunction (the "Amended Motion"). *Id.*, D.E. 23.

96.    MFG's purported Amended Motion for Temporary Restraining Order then asserted that Leafwell's summary of MFG's own allegations constituted admissions on the "record," and also directly responded to the points in Leafwell's

opposition, while also attempting to (unsuccessfully) shore up the many legal and factual deficiencies from its original Motion for TRO. *See id.*

**F. The Court's Order to Show Cause**

97.    On November 6, 2025, the Court struck MFG's Amended Motion for non-compliance with the local rules of the Middle District of Florida. *Id.*, D.E. 24. (However, the Court did not reference Local Rule 6.02(d) or indicate that MFG should have moved for leave; instead, it struck the filing due to MFG's violations of other unrelated local rule(s).)

98.    The same day, the Court issued an Order to Show Cause (*id.*, D.E. 25), directing Castro to show cause "why he should not be sanctioned for his numerous misrepresentations of legal authority to the Court and why he should not pay Defendant's legal fees and costs incurred responding to the motion." *Id.* at 4.

99.    In its Order to Show Cause, the Court noted, among other things, that Leafwell "identifie[d] several areas of serious concern in its response to the motion." *Id.* at 2. This included the fact that §§ 817.505 and 381.986(3)(b) create "no private right of action." *Id.* In fact, "one statute is part of the criminal code." *Id.* But these were not the only "noteworthy discrepancies." *Id.*

100.    Next focusing on MFG's clearly fabricated case law, the Court relayed that it had "spot-checked several (but not all) cases [Leafwell] flagged" and came to the same conclusion as Leafwell did about the many instances of fictitious and/or miscited authority within MFG's filing. *Id.* at 2-3. In any event, the Court declared

that it "need not cite check each one [of the dozen flagged by Leafwell] to see the writing on the wall." *Id.* at 3.

101.    The Court continued by stating that MFG's preceding Notice of Intent (*id.*, D.E. 20) made no effort to explain "what sources [Castro] relied on" or where he found the "sham" cases and quotations. *Id.*, D.E. 25 at 3.

102.    Castro filed his Response to the Order to Show Cause ("MFG's Response") on November 10, 2025. *Id.*, D.E. 30.

103.    On the one hand, Castro claimed to "own what is [his]" (*id.* at 1), and on the other, blamed Leafwell's Counsel for failing to meet-and-confer, failing to clarify the issues, and lacking in professionalism and candor. *See id.* at 2. Castro even went so far as to suggest that Leafwell's Counsel caused the current situation and harm to begin with, and that it was actually Leafwell's Counsel who should be sanctioned. *Id.* at 12.

104.    Within MFG's Response, it precisely and unambiguously laid out its plan for what would happen next. Specifically, MFG previewed that it would "[c]ontemporaneous[ly]" utilize a voluntary Fed. R. Civ. P. 41(a)(1)(A)(i) withdrawal as a mechanism of (i) deliberately minimizing the scope of the Court's potential sanctions against it, while (ii) preserving its ability to "refile [the case against Leafwell] in Florida state court" and attempt to name [nominal] Florida-based defendants for the purpose of defeating diversity and divesting the federal court of jurisdiction over the suit. *Id.* at 15 (expressly "notic[ing]," for the federal Court and Leafwell, MFG's "intent to refile" the same claims against Leafwell "in Florida state court").

105.    Moreover, MFG noted that it was doing so "prior to any ruling on the" Court's order that MFG show cause as to why it should not be sanctioned. *Id.* Indeed, in the days that immediately followed, Castro expressly told Counsel for Leafwell that the U.S. District Court for the Middle District of Florida now lacked jurisdiction over MFG in connection with the scope of potential sanctions.

106.    And on November 10, 2025, MFG did exactly what it told the Court that it would – it filed a Notice of Voluntary Dismissal of the First Federal Court Action (*id.*, D.E. 31).

107.    And yet, from November 11, 2025 onward, Castro continued to email Leafwell's Counsel threatening that MFG would be filing a new similar suit again against Leafwell, Leafwell's leadership team, and various dispensaries/MMTCs. Through Castro, MFG used these threats against Leafwell in furtherance of its continuing campaign to use its AI-generated theory/ies and resulting complaint, and/or the threat thereof, to improperly force Leafwell to alter its business with the ultimate objective of shutting it down.

**G. The November 26, 2025 Opinion and Order in the First Federal Court Action**

108.    On November 26, 2025, the Court issued its Opinion and Order regarding its Order to Show Cause and imposed sanctions against MFG's In-House Counsel. *Id.*, D.E. 37.

109.    Therein, the Court reiterated that it "confirmed several of Defendant's claims about Plaintiff's dubious citations" prior to issuing the Order to Show Cause

(*id.* at 3), and that the TRO Motion "contained fabricated citations, citations that do not contain quoted language, and citations that do not relate to the purported proposition." *Id.* at 7.

110.    The Court also stated that "[r]ather than take responsibility for the legal inaccuracies permeating his Motion for TRO, Mr. Castro's response to the Order to Show Cause is as colossal a collection of excuses and projection as the Court has seen in 25 years on the bench." *Id.* at 7-8. MFG's (In-House) Counsel took "no responsibility for his actions," and – true to form – turned an "unconvincing" defense into a "blustering offense." *See id.* at 11. The Court further stated that Castro's accusations that Leafwell's Counsel was in violation of the Florida Rules of Professional Conduct were "baseless[]" and would not be "entertain[ed]." *Id.*

111.    Thus, the Court rejected all of the bluff and bluster that MFG's Counsel advanced, and once again saw the writing on the wall – noting that MFG's "reckless use of AI" explained the situation at hand. *Id.* at 11.

112.    Per the Court, "leniency [was] not the order of the day" because of the situation MFG's In-House Counsel created. *See id.* at 10. Castro's misrepresentations and refusal to take responsibility "require[d] strong sanctions." *Id.* at 13.

113.    Therefore, as a starting point, the Court ordered Castro to pay Leafwell's fees and costs incurred in responding to the TRO Motion (as well as in compiling the fee application that would follow). *Id.* at 13.

114.    The Court also ordered Castro to: attach the Opinion and Order to any case he files or removes to the Middle District of Florida during the next two (2) years;

attend an in-person continuing legal education on the ethical use of AI; send a copy of the Opinion and Order to Garulay, and then file a notarized affidavit executed by Garulay confirming that Garulay did, in fact, read it.[13] *Id.* at 14-15. Further, Castro was referred to the Florida Bar for appropriate discipline, and the Clerk was directed to transmit the entire record of the Federal Court Action to the Florida Bar. *Id.* at 15.

115.    Despite the conduct of its In-House Counsel, MFG was not sanctioned and maintains the ability to continue to harass Leafwell by filing a new action. *See id.* at 13. But the record that had developed during the "unusual" and "rapid" events in the case (*see id.* at 6) did not accurately reflect Castro's position within MFG, the totality of MFG and Garulay's conduct, and the harm that they inflicted on Leafwell.

116.    And once MFG filed its Notice of Dismissal, the Court found that it was effectively "deprived of jurisdiction over the merits of the case." *Id.* at 4. This rendered all pending motions moot, *see id.* at 15-16, including Leafwell's filed request to expand its sanctions to include and/or apply to MFG (as an entity/party) as well. Consequently, such request has not (yet) received any substantive consideration.

117.    Leafwell incurred a substantial amount of attorneys' fees and costs in defense of a lawsuit brought for the purpose of shutting the company down. Based on the conduct of MFG's employee(s) and leadership, Leafwell expended substantial resources defending itself – both inside and outside of Court – against MFG's legal

---

[13]    Garulay submitted his affidavit, stating, in part, "I wish for [Castro] to continue representing Plaintiff in this matter. I trust him to protect the interest of the company." First Federal Court Action, D.E. 40.

arguments hallucinated by AI, MFG's purported evidence that did not exist, MFG's "Verified Complaint" that contained blatant falsities as per its own exhibits, MFG's repeated efforts to extort commercial information from Leafwell, and MFG's attempts to bring the company down in the marketplace in order to gain competitive advantage over Leafwell.

### H. Subsequent Federal Actions and the Second State Action

118.   On December 5, 2025, seeking to be made whole and put a stop to MFG's ongoing tortious conduct, Leafwell initiated the instant action (also referred to as the "Second Federal Court Action"), and filed a complaint against MFG for Declaratory Relief Pursuant to 28 U.S.C. § 2201, Request for Pre-Filing Injunction Pending Satisfaction of Sanctions, Injunction Precluding MFG from Filing in State Court, tortious interference, negligent supervision, and abuse of process. *See* D.E. 1.

119.   MFG was formally served with process of the original complaint in the instant action on December 10, 2025 (*see* D.E. 14). But prior to that point, mere hours after the instant case was filed, MFG acknowledged it through an email from Castro to Leafwell's Counsel, declaring: "Did you really just file that while there's an ongoing order [*sic*, motion] for reconsideration [of the sanctions order in the First Federal Court Action] and bring up private information . . . All you did was make yourself look bad because you didn't know what you were talking about before filing."

120.   But notwithstanding its direct knowledge of the pendency of a related action involving the same key players, events, and nexus of allegations, on December

28, 2025 – and in knowing violation of Fed. R. Civ. P. 13 (requiring pleading of compulsory counterclaims against opposing party), as well as the so-called "First to File" rule – MFG delivered on its threats to sue Leafwell for the second time in state court and add [nominal] in-state defendants in an attempt to avoid diversity jurisdiction. *See Doc App, Inc. d/b/a My Florida Green v. Leafwell, Inc., et al.*, filed in the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, under case no. 11-2025- CA-002981-0001-01 (the "Second State Court Action"). The complaint in the Second State Court Action involves the same or substantially similar allegations and legal claims as those alleged in the First State Court Action, i.e., the allegations in both actions center upon Leafwell's alleged free certification events and the legal theories are essentially the same.

121.    On December 31, 2025, Leafwell removed the Second State Court Action to this Court pursuant to, *inter alia*, the Court's diversity jurisdiction and principles of fraudulent joinder. *See Doc App, Inc. d/b/a My Florida Green v. Leafwell, Inc., et al.*, 2:25-cv-1231-KCD-DNF (M.D. Fla.) (the "Third Federal Court Action").

122.    On January 7, 2026, in the instant action, Leafwell filed a Motion to Consolidate the Second and Third Federal Court Actions, which remains pending as of the date of this Amended Complaint. *See* D.E. 20.

123.    On January 6, 2026, in the Third Federal Court Action, MFG filed a motion to remand the case back to Collier County Circuit Court. 2:25-cv-1231-KCD-DNF, D.E. 9. Leafwell's opposition thereto is due to be filed by February 3, 2026. *Id.*, D.E. 20.

124.    On January 12, 2026, in the Third Federal Court Action, Leafwell filed a Fed. R. Civ. P. 41(d) Motion to Stay and for Fees, which remains pending as of the date of this Amended Complaint. *Id.*, D.E. 14. That motion seeks an order (i) for MFG to pay to Leafwell costs/fees incurred in defending against the First Federal Court Action, as well as (ii) an order staying MFG's ability to prosecute any related actions against Leafwell until MFG satisfies any award and orders for MFG and its employee(s) to pay fees/costs to Leafwell. *Id.*

125.    Moreover, the Third Federal Court Action is only the latest facet of MFG's continuing ploy by MFG – to leverage its inherently deficient AI-generated complaint/lawsuit and underlying theory – in order to force Leafwell to fold as a business and give in to MFG's unsubstantiated demands.

126.    Further evidence of the fact that the whole premise of MFG's First and Second Federal Court Actions is (i) deficient, (ii) AI-hallucinated/generated, and (iii) not substantively vetted by humans working for MFG is that MFG is apparently doing the very same thing that it accuses Leafwell of wrongfully doing. Put another way: If, hypothetically, MFG's underlying theory – that patients were not directly responsible for the physicians' fees at Leafwell's alleged events (*see* Case No. 2:25-cv-01231-KCD-DNF, D.E. 5 at ¶ 28 (original emphasis) (alleging "doctors must be paid (*and only by patients*)") – were accurate, then it would also automatically follow that MFG is similarly violating Florida law in precisely the same manner. The reasons for this are as follows:

127.   *First,* MFG insists that "doctors must be paid (*and only by patients*)." *See* Case No. 2:25-cv-01231-KCD-DNF, ⁋ 28. But MFG (very publicly) offers free re-certifications for select clientele.[14] Therefore, at least some MFG patients are, evidently, not paying for their own consultations.

128.   *Second*, MFG also advertises for dispensaries on its website.[15] As just one example, MFG tells its own customers that The Flowery "guarantee[s] exceptional quality" and "aims to build strong and lasting connections with their customers[.]"[16] MFG's website also provides links directing customers to the identified dispensaries.

129.   *Third,* upon information and belief, MFG receives compensation from MMTCs for advertisements on MFG's website.

130.   Additionally, that final point – that MFG, itself, partners with some of the named Defendants in the Third Federal Court Action – also constitutes further evidence of MFG's improper motive and conduct in naming those Florida-based dispensary Defendants. Specifically, MFG is actually marketing partners with those Defendants; so, following through with MFG's claims against the MMTCs would very plainly impede MFG's existing financial relationships with MMTCs and damage its status within the medical marijuana community. Thus, on information and belief, MFG has no intention of pressing its claims against any of the dispensaries/MMTCs it named as Defendants in the Third Federal Court Action; Leafwell is, and has always

---

[14]    *See* https://myfloridagreen.com/faq/ (last visited Jan. 26, 2026) (stating for select customers that "[a]ll 7-month follow-ups are on us" and re-certification is free for specific population).
[15]    *See* https://myfloridagreen.com/dispensaries/ (last visited Jan. 26, 2026).
[16]    *Id.*

34

been, its only real target. Indeed, MFG's newest lawsuit is (yet again) an effort to leverage its inherently deficient AI-hallucinated theory/ies to wrongfully eliminate a competitor via the judicial process.

131.    And, relatedly, as of the date of this filing, MFG still has not served those Defendants with process in the Third Federal Court Action. This is of course, once again, because MFG has no intention of actually litigating against them.

132.    Instead, on information and belief, MFG only named new Florida-based Defendants (whose involvement it knew of when it originally filed the First State Court Action against Leafwell) so that it could try to improperly evade sanctions in the First Federal Court Action, as well as this Court's jurisdiction. Really, all newly-named Florida-based Defendants are fraudulently-joined nominal Defendants.

**I.    Castro's Prior Efforts to Evade Sanctions, and MFG's Knowledge of Castro's Prior Sanctions**

133.    After the Court imposed some sanctions against Castro in the First Federal Court Action, Leafwell learned – through information entirely contained within the public record – that Castro has a history of attempting to avoid court-ordered sanctions against him. Due to the "unusual, rapid procedural development" in the First Federal Court Action (*id.* at 6), this information had not been part of the record in the First Federal Court Action when the Court's November 26, 2025 Opinion and Order was issued on the question of sanctions. *See generally*, *id.* at D.E. 37. In fact, such information had not even been discovered prior to the day that the Court filed its Order to Show Cause. Specifically:

35

134.    On December 4, 2023, Judge Kyle Cohen of Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida entered two sanctions orders against Castro: one for Castro's severe deposition misconduct and one for **fabricating allegations in a complaint.** *See William P. Lindemann v. Andrea Balsamo et al.*, Case No. 2020-CA-004033 (Collier County, FL Cir. Ct.). These sanctions orders are attached hereto as **Exhibit E**. Notably, the court wrote that the evidence established that certain allegations in Castro's complaint were both "factually incorrect" and "appear to have been *imagined* by Attorney Castro." The court ruled that Castro was personally responsible for paying opposing counsel's attorneys' fees and costs and expressly "reserve[d] on the amount of those attorney's fees and costs." On May 17, 2024, the court entered the fee award, "awarding attorneys' fees and costs against Jason Kenneth Castro as a sanction."  This fee order is attached hereto as **Exhibit F.**

135.    On April 1, 2024, in the interim between being sanctioned and the amount of attorneys' fees still pending in the *Lindemann* action, Castro filed for Chapter 7 bankruptcy in the Western District of Pennsylvania. *See generally In Re. Jason K. Castro*, United States Bankruptcy Court, Pennsylvania Western, No. 24-bk-20769 (the "Bankruptcy Action"). A copy of Castro's petition (Bankruptcy Action, D.E. 8) is attached hereto as **Exhibit G**.

136.    In his petition, Castro listed his employer as The Doc App, Inc., the same party that is, for purposes of this action and the pertinent events, doing business as MFG. Ex. G at 23.

137.    The creditors listed on Castro's petition included multiple Florida law firms, multiple Florida attorneys, Andrea Balsamo and her counsel, Judge Kyle Cohen, the Collier County Clerk of Courts, and the Florida Bar. *See id.*, 15-19. All such creditors, no doubt, are evidence of the fact that Castro took such action in order to avoid paying court-ordered sanctions.

138.    Garulay, as MFG's CEO, knew or should have known of Castro's history of taking measures to avoid fulfilling sanctions, such as filing for bankruptcy. Castro stated on his petition that he was employed by Garulay's company at the time; or, at the very least, was required to inquire of Castro given his status as MFG's In-House Counsel.

139.    Furthermore, and separately, Garulay's apparent (on information and belief) prior request of Castro – to provide Garulay, a non-lawyer, with all cases referenced in his filings prior to submission – serves as additional evidence of Garulay's prior knowledge of the likelihood that Castro (and/or Castro's AI platform of choice) would include hallucinated or imagined law and/or facts within court filings. Such prior request is impliedly referenced in a communication from Castro to his client that Castro needed the brief to be filed, that he provided "all cases [ ] cited," and he required a "notice of filing case law." *See* Case No. 2:25-cv-00838-SPC-NPM, D.E. 48-2.

140.    In any event, the Bankruptcy Court discharged Castro's debt on July 31, 2024, and the matter was closed on August 29, 2024. Bankruptcy Action, D.E. 15 & 18. It is not clear whether Castro ever paid any of the monetary sanctions that had been ordered against him. But, the trustee's July 30, 2024 report (*id.*, D.E. 13), strongly suggests that Castro was not ultimately required to pay his sanctions-related debts through the following statement contained therein: "Claims Scheduled: $828318.92, Claims Asserted: Not Applicable, Claims scheduled to be discharged without payment (without deducting the value of collateral or debts excepted from discharge): $828318.92."

141.    Separately, MFG had actual knowledge that Castro has engaged in sanctionable conduct in the past. Castro has represented MFG in at least one other case, wherein Castro was sanctioned for missing a court conference and "needlessly wasting" the Court and parties' time. *See Alter Business Advisors, LLC v. The Doc App, Inc. et al.*, Case No. 2:23-cv-715-JLB-KCD (M.D. Fla.), D.E. 27.

## COUNT I

### Declaratory Relief Pursuant to 28 U.S.C. § 2201
*Declaration that as his employer, MFG (and by extension the Doc App, Inc.) is vicariously liable for Castro's conduct, and thus for the monetary sanction that has been imposed.*

142.    Leafwell repeats and incorporates Paragraphs 1 through 141 as if fully set forth herein.

143.    Castro is MFG's In-House Counsel and employee.

144.    At least as of the day of this filing, MFG publicizes Castro as its corporate In-House Counsel on its website. Castro also appears on MFG letterhead identifying him as "IHC" or "Inhouse Counsel." In addition, Castro stated in a bankruptcy filing that he is employed by MFG.

145.    At all relevant times, Castro worked under the direction and control of MFG and its CEO, Garulay.

146.    At all relevant times, MFG, through Garulay, acted in a manner demonstrating their knowledge of MFG's allegations and the planned course of conduct, by, for example, signing notarized affidavits under penalty of perjury that were attached to the Verified Complaint. MFG, through Garulay, and Castro orchestrated a scheme to extort business information from Leafwell and ruin its business – to the benefit of MFG and the detriment of Leafwell – through oppressive litigation and conduct grounded thereupon.

147.    Throughout, MFG itself was a knowledgeable, enthusiastic, and active participant in the litigation and events surrounding it. This is evidenced by a number of facts, events, statements, and materials; they include, but are not limited to, MFG's posting of multiple articles to its website and its Facebook posts discussing the lawsuit; the fact that MFG (by and through Garulay) apparently was directly responsible for submitting some, and perhaps all, of MFG's court filings; that MFG (by and through Garulay) was apparently specifically responsible for vetting the law contained within those filings; and MFG filed suit against Leafwell a second time in Florida State Court

without any significant change as to its (unsounds) theories of liability against Leafwell.

148.    Garulay, as the CEO, was a knowledgeable, enthusiastic, and active participant in the litigation and events surrounding it. This is evidenced by a number of facts, events, statements, and materials; they include, but are not limited to, his commenting about the lawsuit on Facebook; his interview with a local news channel; his public threats to refer Leafwell to Florida state agencies; his public threat to "take the business down"; and his endorsement of affidavits, among other things.

149.    Castro has been sanctioned in the past, including for fabricating allegations.

150.    MFG also knew that Castro has been sanctioned for conduct, given that it happened in a case involving the parties.

151.    Additionally, Castro has a history of taking measures to avoid fulfilling sanctions orders against him – such as bankruptcy proceedings; this is something that Garulay, as MFG's CEO, necessarily knew or should have known.

152.    Evidently, leveraging his knowledge and experience with avoiding sanctions in the past, Castro took preemptive steps purposed upon insulating his employer, MFG, from any potential fall-out from his misconduct (likely that might result from his unabashed and reckless use of AI, among other things). In doing so, Castro knowingly misled the Court regarding his relationship with MFG.

153.    Specifically: Castro's pleadings in the First Federal Court Action identified his position as MFG's Counsel in his signature block for the deliberate

40

purpose of misleading the Court that he was nothing other than outside counsel. *See e.g.*, First Federal Court Action, D.E. 17 at 23.

154.    The Court in the First Federal Court Action has already determined that Leafwell is entitled to its fees and costs incurred in connection with opposing MFG's TRO Motion. Because of the record in the First Federal Court Action, as things currently stand (and by and through the text of the pertinent Court order) Castro – as an individual – is directly responsible for making this payment in the first instance.

155.    However, with (upon information and belief) MFG's and Garualy's direct knowledge and endorsement, Castro filed a Notice of Voluntary Dismissal in the First Federal Court Action – which, upon information and belief, was done in an effort to minimize the scope and/or impact of sanctions against him altogether; and, per his own admission, enable him to simply re-file the same lawsuit against Leafwell in state court, as he did in the Second State Court Action.

156.    Due to Castro's history of failing to pay and then employing techniques to evade sanctions, a substantial likelihood and present controversy exists that Castro will not pay any amounts he is ordered to pay to Leafwell in the First Federal Court Action.

157.    As a result, a present controversy and substantial likelihood exists that Castro concealed his position as In-House Counsel for MFG in order to insulate the company from any sanctions orders.

158.    Additionally, a present controversy and substantial likelihood exists that Castro will attempt to evade any sanctions award entered by the United States Middle District of Florida.

159.    A present controversy also exists as to whether – under the doctrine of respondeat superior – MFG should be deemed vicariously liable, and thus ultimately responsible, for paying the attorney-fee sanctions that Castro has been ordered to pay.

160.    In addition, and based on Castro's conduct to the Court in the First Federal Court Action, a present controversy and substantial likelihood exists that Castro concealed his position as In-House Counsel for MFG in order to insulate the company from any sanctions orders.

161.    Finally, to be clear: Leafwell is not asking for a judgment that would revisit or reconsider the Court's prior order that levied the sanctions at issue against Castro (as an individual) specifically. Instead, Leafwell is seeking a judgment declaring that, due to the surrounding circumstances, MFG is ultimately responsible (under the doctrine of *respondeat superior* and/or vicarious liability) for fulfilling the monetary sanctions order that has been levied against Castro in the First Federal Court Action.

162.    Ultimately, for all of the reasons previously stated—including that MFG and Garulay approved of or directed the filing of the Motion for TRO, signed affidavits in support of the "Verified Complaint" under penalty of perjury, engaged in a media smear campaign against Leafwell, and otherwise directed the filing of and directly participated in MFG's vexatious and frivolous litigation—although Castro was

ordered to pay the sanctions, MFG, as his employer, should be deemed responsible for paying them.

**WHEREFORE**, Leafwell respectfully requests that this Court issue a declaration, declaring that:

    a) MFG is vicariously liable for Castro's conduct on its behalf in relevant part under the doctrine of *respondeat superior* and applicable principles, and MFG is therefore obligated to answer for Castro's conduct because Castro was its employee, acting under its authority and at its direction;

    b) For these reasons, MFG is liable to Leafwell for any and all of the sanctions levied against Castro, and Leafwell may accordingly enforce any sanctions judgment against MFG issued in the First Federal Court Action; and

    c) Any other relief this Court deems just and proper.

## COUNT II
### Anti-Suit Injunction Staying or Precluding MFG's Prosecution of the Second State Court Action and/or the Third Federal Action due to the Instant (Earlier-Filed) Case that is Now Pending Before this Court

163.    Leafwell repeats and incorporates Paragraphs 1 through 141 as if fully set forth herein.

164.    MFG filed the Second State Court Action, which has since been removed to this Court as the Third Federal Court Action, based on the same subject matter that makes up the First Federal Court Action as well as the instant action.

165.    The Parties in the instant action and in the Second State Court Action (i.e., the Third Federal Court Action), MFG and Leafwell, are effectively the same. While MFG named additional individuals and entities in the Second State Court

Action, it did so fraudulently in an explicit effort to defeat diversity jurisdiction. *See* Third Federal Court Action, 2:25-cv-1231-KCD-DNF, D.E. 1 ¶¶ 57-64. And, for the reasons previously stated in Paragraphs 128-132, they are nominal Defendants that MFG does not actually intend to prosecute.

166.    Given the similarity and overlap of claims, facts, and theories underlying this now-pending earlier-filed Second Federal Court Action on the one hand, and MFG's Second State Court Action (i.e., the Third Federal Court Action), resolution of the instant action before this Court would, effectively, be dispositive of the claims raised within that later-filed action.

167.    This case presents an exception to the Anti-Suit Injunction Act, 28 U.S.C. § 2283, because granting the requested injunction would be necessary to aid this Court's jurisdiction or to protect or effectuate its judgments. There are two interrelated bases for this assertion:

168.    *First,* MFG wholesale ignored its obligation to file compulsory counterclaims (*see* Fed. R. Civ. P. 13) against Leafwell in this matter; and, instead, decided that it would file a new action in Florida state court of its own accord (the Second State Court Action).

169.    *Second,* based on the "first-to-file" doctrine that is universally recognized in federal courts, *this* matter – stemming directly from Leafwell's earlier-filed Complaint (*see* Case No. 2:25-cv-1132-JES-DNF, D.E. 1) – is the first action filed based on the same, similar, or overlapping subject matter that is discussed herein (with

the exception, of course, of the First Federal Court Action, which is now closed as to its merits following MFG's self-effectuating notice of voluntary dismissal).

**WHEREFORE,** consistent with the law, Leafwell respectfully requests that this Court issue an injunction preventing MFG from litigating the Second State Court Action (i.e., the Third Federal Court Action) against Leafwell.

## COUNT III
### Abuse of Process

170.    Leafwell repeats and incorporates Paragraphs 1 through 141 as if fully set forth herein.

171.    MFG initiated the First and Second State Court Actions under the premise that it wanted to stop Leafwell's purportedly "unlawful practices."

172.    However, MFG deliberately and intentionally misused the legal process for the improper purpose of extorting Leafwell for information and ruining its business entirely, all for MFG's benefit. MFG, through Garulay, worked in tandem with Castro to facilitate a scheme of oppressive litigation to accomplish this goal.

173.    Upon information and belief, MFG, through its In-House Counsel, Castro, constructed legal theories, pleadings and arguments using AI in order to manufacture seemingly forceful litigation against Leafwell. And, once MFG got caught, and realized that the Court was on the verge of discovering that the whole "Verified Complaint" was recklessly generated by AI, it immediately withdrew the First Federal Court Action in order to avoid the full scope of sanctions.

174.    In turn, Castro, as MFG's In-House Counsel, repeatedly used the State and Federal Court Actions as leverage to attempt to improperly obtain Leafwell's confidential business information outside of the judicial process and without protection from further disclosure. This is evidenced by Castro's repeated demands that Leafwell produce business information that was unconnected with MFG's stated complaint – under the guise of a C&D Demand and meet-and-confers.

175.    For example, MFG's C&D Letter demanded that Leafwell provide an assortment of information to MFG or face a civil action. Once litigation commenced, Castro repeatedly demanded confidential information from Leafwell – that it would then use to further its own ends against Leafwell and others – under the pretext of meet-and-confers, without observing the formality of the judicial process that MFG initiated.

176.    Additionally, on numerous occasions, Castro, as MFG's In-House Counsel, used the lawsuit (or threat of lawsuit) to threaten Leafwell's partners as a means to get Leafwell to fold and/or significantly alter its business practices.

177.    On information and belief, and consistent with information conveyed via MFG's filings in the state court actions, MFG's goal in doing so was to harm Leafwell's ability to maintain clients, and get more clients, so that they would work with MFG instead.

178.    Further, MFG, Garulay, and Castro commenced a media campaign against Leafwell. For example, MFG published an article titled "How My Florida

Green Protects Patients While Leafwell Undermines Trust," which relied solely on its own untenable allegations.

179.    Upon information and belief, MFG intended to use its fabricated legal position as a means to improperly siphon off Leafwell's customer base, damage its marketplace standing, and destroy its goodwill.

180.    Moreover, MFG's true intention for both of its filed state court actions (and later First and Third Federal Court Actions) was to remove Leafwell as a competitor in the marketplace entirely, as evidenced by Garulay's declarations that he would "take the business down" and "[t]hese people are going down, and hard!"

181.    Meanwhile, MFG, through its own In-House Counsel, fabricated case law to support its legal theories. Indeed, and indisputably, MFG's In-House Counsel used AI without proper vetting for its TRO Motion, which has also been acknowledged by the Court. *See* First Federal Court Action, D.E. 37.

182.    Upon information and belief, MFG had ulterior motives for filing the state court actions; specifically, the purpose of MFG's litigation was to drain Leafwell's resources thereby impairing the business's ability to operate, extract Leafwell's confidential and proprietary business information to obtain an unfair advantage, interrupt Leafwell's business partnerships, detrimentally impact Leafwell's ability to gain new customers and keep its own customers, and to otherwise extort or ruin Leafwell's business.

183.    The so-called "litigation privilege" does not preclude this claim (nor damages arising therefrom) for either or both of two independent reasons – either of which necessarily constitutes a sufficient basis for this claim's survival:

184.    *First*, the "litigation privilege" cannot, and should not, be extended so as to protects a defendant from liability against harm to another party that resulted from that defendant's reckless and improper use of use of AI – even if such AI use was technically funneled (whether in whole or in part) through the defendant's Court filings. (And notably, for instance, case law already acknowledges that the attorney-client privilege does not apply in the context of certain scenarios involving the perpetration of fraud.)

185.    *Second*, even if the "litigation privilege" were to be expansively interpreted – for the first time, here – as protecting defendants against their reckless use of AI as funneled through Court filings, Leafwell's theory of harm/damages is not limited solely to MFG's litigation-specific conduct. To the contrary, the damage Leafwell sustained at the hands of MFG is also the product of its campaign to destroy Leafwell through the media, at in-person events, and otherwise eliminate Leafwell as a competitor – leveraging its own  AI-hallucinated suit/legal theories in the process.

186.    As a result of all of this, Leafwell has suffered substantial damage and harm, including but not limited to: substantial attorneys' fees and costs exceeding $75,000 in defense of MFG's Verified Complaint and the First Federal Court Action in addition to MFG's Second State Court Action and the Third Federal Court Action;

loss of goodwill, loss of existing business relationships, loss of customers, loss of status within the business community, and the like; and other amounts to be proven at trial.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

    a) All attorneys' fees incurred in the First and Second State Court Actions and First and Third Federal Court Actions, minus those actually paid pursuant to the November 26, 2025 Opinion and Order in the First Federal Court Action;

    b) Any and all other damages, to be subsequently determined, stemming from harm to Leafwell's goodwill, business, and customer base, that resulted from MFG's conduct and campaign that were grounded on the AI-generated complaint(s) and the resulting action;

    c) Any other relief this Court deems just and proper.

## <u>COUNT IV</u>
### MFG's Negligent Supervision of Castro (its In-House Counsel)

187.    Leafwell repeats and incorporates Paragraphs 1 through 141 as if fully set forth herein.

188.    Castro and MFG were in an employer-employee relationship, with Castro acting as MFG's (expressly acknowledged) In-House Counsel. To that point, MFG reviewed Castro's work, actively reviewed any pertinent case law on which Castro relied, and filed MFG's briefings at Castro's explicit direction.

189.    Moreover, Castro himself has repeatedly held himself out as MFG's In-House Counsel in multiple official documents contained within the public record. This includes a profile on MFG's website holding Castro out as the company's In-House Counsel, the inclusion of MFG as Castro's employer on bankruptcy filings, and other

things. (And this is true notwithstanding Castro's and MFG's attempts to mislead the Court in the First Federal Action by claiming to operate through the "Law Office of Jason K. Castro, PLLC" (*see* Case No. 2:25-cv-00838-SPC-NPM, D.E. 17 at 23-24) – with specific purpose of trying to insulate MFG from liability and/or responsibility for the misconduct perpetrated by Castro on its behalf in the First Federal Court action.)

190.    As such, MFG had a duty to supervise Castro's conduct to ensure that he was fit for the role and would not engage in tortious or sanctionable conduct through his position as the company's attorney.

191.    In fact, MFG knew that Castro has engaged in sanctionable conduct in the past. Castro has represented MFG in at least one other case, wherein Castro was sanctioned for missing a court conference and "needlessly wasting" the Court and parties' time. *See Alter Business Advisors, LLC v. The Doc App, Inc. et al.*, U.S. District Court, M.D. Florida, Case No. 2:23-cv-715-JLB-KCD, D.E. 27.

192.    Further, and separately, because MFG employed Castro as its In-House Counsel, it also knew or should have known about Castro's past history of court-ordered sanctions – including any instance of fabricating allegations.

193.    Further, and separately, MFG appears to have had reason to know, suspect, or believe, that Castro would likely submit materials containing AI-hallucinations to Courts. This is evidenced by non-lawyer Garulay's apparent protocol for Castro to provide for his review all caselaw cited within some or all of MFG's filings prior to submission.

50

194.    Ultimately, and regardless of Garulay's specific reasons for making the aforementioned request of Castro, MFG negligently breached that duty by failing to prevent Castro from continuing to engage in sanctionable behavior, such as fabricating case law leading to the imposition of sanctions. *See* First Federal Court Action, D.E. 37.

195.    MFG facilitated Castro's sanctioned conduct; MFG, through Garulay, reviewed the AI-generated Motion for TRO before it was filed, and facilitated its filing with the Court pursuant to Castro's explicit instructions. *See id.*, D.E. 48-2.

196.    In doing so, MFG did not take any action to stop Castro from filing the Motion for TRO or from otherwise engaging in the vexatious and frivolous litigation complained of herein.

197.    Moreover, MFG breached its duty to supervise Castro by ensuring that he would refrain from using existing judicial process to attempt to extort confidential information from Leafwell, as described herein.

198.    Castro was acting within the course and scope of his employment with MFG when he engaged in the conduct for which he was sanctioned.

199.    As a result of MFG's failure to adequately supervise Castro and his conduct, Leafwell has suffered damage in the form of attorneys' fees, lost economic opportunities, and lost goodwill.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

a) All attorneys' fees incurred in the First and Second State Court Actions and First and Third Federal Court Actions, minus those actually paid pursuant to the November 26, 2025 Opinion and Order in the First Federal Court Action;

b) Any and all other damages to be subsequently determined, including actual and consequential damages, stemming from harm to Leafwell's goodwill, business, and customer base, that resulted from MFG's conduct and campaign that were grounded on the AI-generated complaint(s) and the resulting action;

c) Any other relief this Court deems just and proper.

## COUNT V
### Tortious Interference with Contractual Relationships

200.    Leafwell repeats and incorporates Paragraphs 1 through 141 as if fully set forth herein.

201.    MFG's conduct described herein had the overarching impact, and was indeed admittedly purposed upon, harming Leafwell's economic advantage over its competitor, MFG. It did so through a deliberate and multi-step scheme intended to destroy current client relationships, destroy potential client relationships, and to destroy relationships with the third parties with which it collaborates to provide services to its clients. Leafwell was economically damaged by all of this conduct.

202.    Leafwell is a telehealth platform that assists patients with obtaining medical marijuana cards. Leafwell publicly holds itself out as working with a network of doctors on its website.

203.    Leafwell has lost contractual relationships as a result of MFG's intentional and unjustified conduct.

204.    In the course of its business, Leafwell collaborates, and has relationships with physicians, medical providers, and other third-party entities for varying purposes and functions. Insofar as contracts are involved in whole or in part, many of them are at will.

205.    On information and belief, MFG was aware that these contracts and agreements with Leafwell were in place, evidenced by MFG's intentional and unjustified cease and desist demands to dispensaries and other companies/ Leafwell partners via email on September 30, 2025, copying Leafwell.

206.    Such conduct was (i) detrimental to Leafwell's ability to retain current customers/clients; (ii) detrimental to Leafwell's ability to engage additional customers and/or partners, which had already begun the process of forming relationships with Leafwell; (iii) detrimental to Leafwell's ability to solicit new business; and, moreover, (iv) detrimental to Leafwell's ability to continue with its existing partners and/or collaborators with which it had existing agreements.

207.    After MFG initiated the First State Court Action, it went on an aggressive public media campaign against Leafwell, premised entirely on the largely AI-hallucinated, and inherently deficient, unvetted allegations and theories that were contained within its own Verified Complaint. Such conduct was, similarly, detrimental to (i)-(iv) described above.

208.    For instance, prior to September 19, 2025, Leafwell had an independent contractor agreement with a specific physician to help Florida patients obtain access

53

to medical marijuana certifications through Leafwell. Because this was part of Leafwell's business, it expected that the relationship would continue.

209.   On September 19, 2025, this physician submitted a resignation letter to Leafwell, stating "I have recently been made aware of serious legal concerns regarding participation in dispensary-subsidized events in Florida." The resignation letter continued by parroting the public allegations made by MFG against Leafwell.

210.   This physician stated that "[w]hile I have not personally received legal notice, my awareness of these industry-wide risks creates an untenable situation." As a result, the physician terminated the independent contractor agreement.

211.   Through its substantial public media campaign, undertaken without justification or excuse, MFG intended to cause physician(s) such as this one to sever their relationships with Leafwell. This was only amplified by MFG's conduct in the First Federal Court Action and subsequent litigation.

212.   In fact, at least one other physician working under an agreement also resigned from Leafwell; on information and belief, such resignation was the direct result of MFG's conduct.

213.   MFG was aware of these contractual/business relationships when it engaged in the actions described herein.

214.   And, once more, because these things affected Leafwell's operations, such impacts of MFG's conduct also had the additional effect of impeding Leafwell's ability to (i) maintain existing customers, and also (ii) secure additional interested

54

customers with which had already begun the process of forming a relationship with Leafwell.

215.    In addition, Garulay attended an in-person Leafwell event on October 3, 2025. While there, Garulay created a massive disturbance and acted in a threatening manner – all without any justification or excuse.

216.    All public participants at this event (including Garulay) registered in advance with Leafwell before attending.

217.    Because of this, Leafwell had the expectation that if a patient was certified for a medical marijuana card, they would continue to transact with Leafwell for services. Garulay knew this because his company provides similar services through a similar means.

218.    Upon information and belief, Garulay's outburst caused prospective patients to leave the event, and to therefore declined to engage in business with Leafwell (engagements that would have been formalized but for Garulay's/MFG's conduct).

219.    Additionally, and more broadly, on information and belief, MFG's conduct that resulted in the loss of Leafwell's third-party co-collaborators detrimentally impacted Leafwell's ability to do business. The effect of that, among other things, was the loss of current and/or prospective clients – and thus the revenue that would otherwise have been gained.

220.    Because of MFG and its CEO's conduct as described above, Leafwell has suffered damages in the form of lost profits, lost economic opportunities, and loss of goodwill in amounts to be proven at trial.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

a) Its actual and consequential damages resulting from MFG's conduct;
b) A permanent injunction, preventing MFG and its executives, officers, and employees from contacting or coming within 300 feet of any Leafwell event, facility, executive, officer, employee, or third-party entity collaborator (or an employee or officer thereof) with which MFG knows that Leafwell has a business relationship, or third-party individual collaborator with which MFG knows that Leafwell has a business relationship.
c) Any other relief this Court deems just and proper.

## COUNT VI
### Tortious Interference with Business or Economic Relationships

221.    Leafwell repeats and incorporates Paragraphs 1 through 141 as if fully set forth herein.

222.    MFG's conduct described herein had the overarching impact, and was indeed admittedly purposed upon, harming Leafwell's economic advantage over its competitor, MFG. It did so through a deliberate and multi-step scheme intended to destroy potential client relationships. Leafwell was economically damaged by all of this conduct.

223.    Leafwell is a telehealth platform that assists patients with obtaining medical marijuana cards. Leafwell publicly holds itself out as working with a network of doctors on its website.

224.    Leafwell has lost existing and prospective economic relationships with its clients as a result of MFG's intentional and unjustified conduct.

225.    Such conduct was (i) detrimental to Leafwell's ability to retain current clients; (ii) detrimental to Leafwell's ability to engage additional new clients; and (iii) detrimental to Leafwell's ability to solicit new business.

226.    After MFG initiated the First State Court Action, it went on an aggressive public media campaign against Leafwell, premised entirely on the largely AI-hallucinated, and inherently deficient, unvetted allegations and theories that were contained within its own Verified Complaint. Such conduct was, similarly, detrimental to (i), (ii), and (iii) described above.

227.    Because these things affected Leafwell's operations, such impacts of MFG's conduct also had the additional effect of impeding Leafwell's ability to (i) maintain existing customers, and also (ii) secure additional interested customers with which had already begun the process of forming a relationship with Leafwell.

228.    Garulay attended an in-person Leafwell event on October 3, 2025. While there, Garulay created a massive disturbance and acted in a threatening manner – all without any justification or excuse.

229.    All public participants at this event (including Garulay) registered in advance with Leafwell before attending.

230.    Because of this, Leafwell had the expectation that if a patient was certified for a medical marijuana card, they would continue to transact with Leafwell

for services. Garulay knew this because his company provides similar services through a similar means.

231.    Upon information and belief, Garulay's outburst caused prospective patients to leave the event, and to therefore decline to engage in business with Leafwell (engagements that would have been formalized but for Garulay's/MFG's intentional and unjustified conduct).

232.    Additionally, and more broadly, on information and belief, MFG's conduct that resulted in the loss of Leafwell's third-party co-collaborators (*see* Count V) detrimentally impacted Leafwell's ability to do business. The effect of that, among other things, was the loss of current and/or prospective clients – and thus the revenue that would otherwise have been gained.

233.    MFG was aware of these business relationships when it engaged in the actions described herein.

234.    Because of MFG and its CEO's conduct as described above, Leafwell has suffered damages in the form of lost profits, lost economic opportunities, and loss of goodwill in amounts to be proven at trial.

**WHEREFORE**, Leafwell respectfully requests that this Court enter judgment against MFG, and award Leafwell:

d) Its actual and consequential damages resulting from MFG's conduct;
e) A permanent injunction, preventing MFG and its executives, officers, and employees from contacting or coming within 300 feet of any Leafwell event, facility, executive, officer, employee, or third-party entity collaborator (or an employee or officer thereof) with which MFG knows that Leafwell has a business relationship, or third-party

individual collaborator with which MFG knows that Leafwell has a business relationship.

f) Any other relief this Court deems just and proper.

## JURY DEMAND

Leafwell reserves the right to trial by jury on all counts so triable.

## PRAYER FOR RELIEF

Leafwell requests judgment and award against MFG for the following:

a) Actual and consequential damages;

b) Pre- and post-judgment interest at the highest rate allowed by law;

c) All attorneys' fees incurred in responding to the First and Third Federal Court Actions (also taking care to ensure, of course, that no court-ordered payments by MFG would duplicate any payments that would have already been made by Castro in connection with the monetary sanctions ordered in the First Federal Court Action);

d) Injunctive relief as described herein; and

e) All other relief at law or in equity to which Leafwell may show itself entitled.

Dated: January 26, 2026          Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Paul Lewis*
Paul B. Lewis, Esq.
*pro hac vice*
paul.lewis@us.dlapiper.com
*Lead Counsel*
Kevin M. Bergin, Esq.
*pro hac vice*
kevin.bergin@us.dlapiper.com
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110
Telephone: (617) 406-6000

Jody Stafford Fernandez
Florida Bar Number: 1015797
jody.stafford@us.dlapiper.com
DLA PIPER LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone:  (305) 702-8890